UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FAIR HOUSING CENTER OF SOUTHWEST    )
MICHIGAN, KENNETH MILLER, and        )
TERESA MILLER,                        )
        Plaintiffs,                   )
                                      )    No. 1:09-cv-593
-v-                                   )
                                      )    HONORABLE PAUL L. MALONEY
JOSEPH HUNT, JON DOOGE,               )
CLAYBORNE COURT APARTMENTS, and      )
CLAYBORNE PARTNERS, LLC,              )
        Defendants.                   )
_____)

## OPINION AND ORDER

## GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 86)

## GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 105)

## GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 114)

This lawsuit arises from alleged housing discrimination at an apartment complex in Kalamazoo, Michigan. Ken Miller, Teresa Miller, and the Fair Housing Center of Southwest Michigan (collectively "Plaintiffs") sued Joseph Hunt, Jon Dooge, the Clayborne Court Apartments, and Clayborne Partners, LLC (collectively "Defendants") for familial status, race, and age discrimination under federal and state statutes. Plaintiffs Ken and Teresa Miller ("Millers") are former residents of the Clayborne Court Apartments ("Clayborne Court" or "Complex"). Their claims against Defendants arise from instances that occurred while renting an apartment at the Complex. Teresa Miller reported alleged instances of housing discrimination to the Fair Housing Center of Southwest Michigan ("FHC"). FHC sent testers to the Complex. FHC's claims arise from

the interactions the testers had with the Complex and on behalf of the residents of and potential residents at the Complex.  Defendants each have some connection to the Complex.  Joseph Hunt ("Hunt") manages the Complex.  Clayborne Partners, LLC ("Clayborne Partners"), owns the Complex.  Jon Dooge ("Dooge") is a member of Clayborne Partners.

These matters come before the Court on three motions.  Defendants filed a motion to dismiss and for partial summary judgment, asserting that none of the three plaintiffs can establish a claim for familial status discrimination.  (ECF No. 86.)  Plaintiffs filed a motion for partial summary judgment on their familial status and age discrimination claims.  (ECF No. 105.)  Finally, Defendants filed a motion for summary judgment on the claims not raised in their first motion.  (ECF No. 114.)  A hearing was held on March 14, 2011, where Defendants' motion for partial summary judgment and Plaintiffs' motion for partial summary judgment were argued.  A second hearing occurred on January 4, 2012, where Defendants' motion for summary judgment was argued.

## I.  FACTUAL ALLEGATIONS IN THE RECORD

### A. CLAYBORNE COURT

1. Clayborne Court is a 140 unit complex located in Kalamazoo, Michigan.  (ECF No. 114-4 "Hunt Dep." 27 PgID 1686.)  The complex includes 96 one-bedroom apartments, 10 two-bedroom apartments, and the rest are studio apartments.  (*Id.* 27-28.)  One unit is not available for rent because it is used for storage.  (*Id.* 27.)

2. In February 2005, Hunt purchased, for Clayborne Court, and red and yellow banner advertisement that reads "Senior Friendly."  (ECF No. 106-5 Invoice PgID 1283.)  At least two banners have been displayed near the entrance of the Complex that state "Senior Friendly."  (ECF No. 106-5 Pictures PgID 1281-82.)  Hunt admits Clayborne Court purchased the banner.  (ECF No.

106-3 Hunt Second Dep. 390 PgID 1273.) Hunt admits the banner has been displayed. (*Id.* 389-90 PgID 1272-73.)

3. In 2004 and 2005, in five printed advertisements, Clayborne Court used the phrase "Senior Friendly." (ECF No. 107-1 PgID 1286-88.)

4. In 2006 and 2007, in seven printed advertisements, Clayborne Court used the phrase "Senior Friendly." (ECF No. 107-3 PgID 1292-95.)

5. In 2006, in a printed advertisement, Clayborne Court used the words "SENIORS Finally, a Quiet Community designed just for you!!" (ECF No. 112-1 PgID 1419.)

6. Clayborne Court distributed a flyer that used the words "ATTENTION SENIORS Finally a community designed just for you!" (ECF No. 108-2 PgID 1307.) Clayborne Court used the same language in an advertisement played on the radio. (ECF No. 116.)

7. In February 2006, in February, March, April, and May 2007, and again in June 2009, Clayborne Court advertised apartments in Section 901, a section devoted to housing for seniors, of the classified advertisements in the Kalamazoo Gazette. (ECF No. 108-1 PgID 1300-05.)

8. Clayborne Court placed ads in a 2010 publication titled "Senior Services Inc. Best of Care." (ECF No. 109-2 PgID 1324-27.) The Complex was advertised in the section titled "Senior Housing (Non-Subsidized)." (*Id.* PgID 1327.)

9. In discovery, Clayborne Court produced a document titled "Tenant Selection Criteria." (ECF No. 109-3 PgID 1329.) The document includes the heading "Occupancy Requirements." (*Id.*) Under that heading is following paragraph:

> WHILE WE DO NOT DISCRIMINATE BASED ON MARITAL STATUS, WE RESERVE THE RIGHTS TO DENY RESIDENCY BASED ON OCCUPANCY NUMBERS PER APARTMENT (ONE PERSON OR COUPLE PER BEDROOM).

3

> OUR OCCUPANCY REQUIREMENTS ARE DESIGNED TO PROTECT US FROM, AND KEEP US IN COMPLIANCE WITH, ANY/ALL CURRENT AND/OR FUTURE FEDERAL/STATE/LOCAL OCCUPANCY CODES.
> TENANT SELECTION CRITERIA SUBJECT TO CHANGE WITHOUT NOTICE.
> WE RESERVED THE RIGHT TO DENY ANY APPLICANT, FOR ANY REASON, WITH THE FOLLOWING EXCEPTIONS: RACE, GENDER, SEXUAL PREFERENCES, AGE (OVER EIGHTEEN).

(*Id.*)  Hunt sent at least two emails to prospective tenants referencing the occupancy requirements in the Tenant Selection Criteria.  (ECF Nos. 169-1 and 169-2 "Prospective Tenant Emails" PgID 3158 and 3159.)  Both emails include the following sentence: "Please note that we do not lease to the inappropriate room size (one bedroom-one person or couple), which comforts you knowing that our community is the quiet spot you have been looking for."  (Prospective Tenant Emails.)

10.  Hunt, as manager of Clayborne Court, keeps a waiting list of people who would like to rent a two-bedroom apartment.  (Hunt Dep. 189 PgID 888.)  Available two-bedroom apartments, however, are not necessarily offered to the name at the top of the list.  (*Id. Id.* 190 PgID 889.)  When the current renters at the top of the list are not successfully living within the rules of the Complex, Hunt will not offer them a two-bedroom apartment.  (*Id.* 190-91.)

11.  Tammie Domaska, a former tenant at Clayborne Court, submitted an affidavit in which she states that Hunt told her he does not rent to families with children.  (ECF No. 169-3 "Domaska Aff." ¶ 3.)

12.  Sharon Filas, an alleged expert in accounting and economic damages, completed a report on behalf of Defendants that includes, among other things, a summary of the demographics of Kalamazoo, Michigan, a summary of housing demographics in Kalamazoo, Michigan, and a summary of the demographics of renters in Clayborne Court Apartments as of August 31, 2008. (ECF No. 150-1 "Amended Filas Report" PgID 2981-91.)

4

## B.  THE MILLERS

13.  The Millers are married and have two adult children, Christina and Nicole.  (ECF No. 86-2 "K. Miller Dep." 20 PgID 689.)  Christina has four children and Nicole has one child.  (*Id.*)  In their brief in response to Defendants' motion for partial summary judgment, the Millers admit they "do not have legal custody of their grandchildren within the meaning of the definition of familial status as contained in the Fair Housing Act."  (ECF No. 90 Pl. Resp. 13 PgID 1017.)

14.  The Millers first rented an apartment at the Clayborne Court in 2004.  (ECF No. 86-3 "T. Miller Dep." 11 PgID 749.)  Initially, the Millers rented a one-bedroom apartment, and several months into their lease, they moved into a two-bedroom apartment.  (*Id.* 13.)  The Millers stayed at Clayborne Court for about one year, before leaving.  (*Id.* 13 PgID 749, 15 PgID 750.)

15.  In 2006, the Millers returned to Clayborne Court.  The Millers wanted a two-bedroom apartment, but were told by Hunt that he only had one-bedroom apartments available.  (T. Miller Dep. 30-31 PgID 754.)  The Millers asked to be put on the waiting list for a two-bedroom apartment.  (*Id.* 31.)  Hunt testified he did not recall when the Millers asked to be placed on the waiting list.  (Hunt. Dep. 194 PgID 890.)  Hunt testified that he does not have any of the old waiting lists with the Millers's name on it.  (*Id.*)

16.  The Millers signed a lease that started on September 1, 2006 and ended August 31, 2007.  (T. Miller Dep. 33 PgID 754; ECF No. 86-3 Lease PgID 805-06.)  The Millers extended the lease from September 2007 through August 31, 2008.  (ECF No. 86-3 Rental Agreement PgID 808-18.)

17.  Teresa Miller worked for the Complex on a sporadic basis, usually for a reduction in rent.  (T. Miller Dep. 40-41 PgID 756.)  She would clean apartments after they were vacated, would perform basic office duties, and she also showed apartments.  (*Id.*)  Eventually, Teresa stopped

5

working for the Complex because the work slowed down and she did not like the way Hunt treated her. (*Id.* 43 PgID 757.)

18. On April 27, 2007, at 3:15 a.m., Nicole Miller called the Kalamazoo Department of Public Safety ("KDPS") to report a domestic disturbance. (ECF No. 86-3 04/07 Incident Report PgID 820-22.) According to the officer who wrote the report, Nicole stated that, when she arrived at the apartment around 2:30 a.m., her parents were drunk and began arguing with her about her boyfriend. (*Id.*) Ken Miller admitted to the officer that he had argued with Nicole about Nicole's boyfriend. (*Id.*) Ken Miller also stated that Nicole owed him money, that she had been living in the apartment without paying rent, and that he was going to have his daughter evicted. (*Id.*)

19. On September 9, 2007, Teresa Miller called KDPS to report a missing child. (ECF No. 86-3 09/07 Incident Report PgID 824-26.) When the officer arrived at the scene, there were several people in front of the apartment, as well as a Kalamazoo County Sheriff's Deputy. (*Id.*) According to the officer who wrote the report, Teresa Miller was watching her grandchild, had fallen asleep, and when she woke up, the child was missing. (*Id.*) The child was four years old, and Teresa had fallen asleep for about two hours. (*Id.*) The officer called the child's mother, Christina, who told the officer that she had picked up the child from the Millers's apartment. (*Id.*)

20. On March 3, 2008, Jeremy Thomas, Christina's boyfriend called KDPS to report an incident at Clayborne Court. (ECF No. 86-3 03/08 Incident Report PgID 828-31.) Thomas told the officer who responded that Thomas and Ken Miller had a physical altercation. (*Id.*) Thomas explained that he went to the Miller's apartment to retrieve some toys that belonged to his daughter, as well as some clothes, and that Ken Miller started yelling at him. (*Id.*) Ken Miller also grabbed Thomas on his arm, but Thomas was able to break free. (*Id.*) Ken Miller denied grabbing Thomas.

(*Id.*) The officer noted in the report that Thomas had a slight red mark on his forearm that was not

bleeding. (*Id.*) Thomas did not want to prosecute, but did want the incident documented. (*Id.*)

21. At some point during this second stay at Clayborne Court, Teresa Miller approached

FHC about Hunt. (T. Miller Dep. 153-54 PgID 784-85.) Teresa made reports to FHC either two or

three times. (*Id.* 161 PgID 786.) The first time she approached FHC, Teresa believed that Hunt was

discriminating against others. (*Id.* 155 PgID 785, 166 PgID 788.) According to Teresa, Hunt told

her that he wanted to cater to an older clientele and he wanted Teresa to avoid people with children.

(*Id.* 156.) Teresa also testified that Hunt directed her not to show apartments to people with children

because the apartments were not big enough. (*Id.* 51 PgID 759.) Because of Hunt's statements, on

several occasions, Teresa told people who had children and who wanted to see apartments, that no

apartments were available, even though apartments were available. (*Id.* 58 PgID 761.)

22. On August 6, 2008, Hunt called KDPS and reported that he had been assaulted by Ken

Miller. (ECF No. 86-3 08/08 Incident Report PgID 836-39.) Hunt told the officer who responded

that Ken Miller had threatened him on two previous occasions. (*Id.*) Hunt told the officer that Ken

Miller entered his office that morning and began talking about a new fence. (*Id.*) While in the

office, Ken Miller slammed a folder on a desk and later grabbed Hunt's phone from him and threw

the phone against the wall. (*Id.*) Hunt then left his office to get away from Ken Miller. (*Id.*) When

Ken Miller eventually left Hunt's office, he bumped Hunt on his way out. (*Id.*) Hunt did not want

to press charges, but did want the incident documented. (*Id.*) The officer did not speak with Ken

Miller. (*Id.*)

23.  Hunt sent the Millers a letter dated August 9, 2008.[1]  (ECF No. 90-3 "08/08 Letter" PgID 1027.)  In the letter, Hunt mentioned that there had been several "unfortunate occurrences."  (*Id.*)  Hunt also wrote that "I would think it would be in everyone's best interest to locate your family into housing that is more suitable to your requirements."  (*Id.*)  Hunt wrote "I don't want to hinder anyone's living environment, but our situation with apartments only marketed to an older clientele, maybe other options would be more appealing to you." (*Id.*)  Hunt admits he wrote the letter.  (Hunt Dep. 234 PgID 1738.)

24.  Teresa made a second report to FHC, this time indicating that Hunt was discriminating against her.  (T. Miller Dep. 160 PgID 786, 166 PgID 788.)  According to Teresa, Hunt told her he would never rent a two-bedroom apartment to her because her grandchildren would then move in with her.  (*Id.* 158 PgID 786.)  Teresa also referenced a letter she received from Hunt, where he stated that he wanted an older clientele.  (*Id.* 160; 08/08 Letter.)

25.  Hunt testified that he did not give the Millers a two-bedroom apartment because they were violating the rules of the community, including noise violations, complaints from residents, police reports, and assaults.  (Hunt Dep. 191 PgID 889.) Hunt testified that he decided not to offer a two-bedroom apartment to the Millers only after the alleged assault on him by Ken Miller.  (*Id.* 192 PgID 889.)

### C.  FAIR HOUSING CENTER

---

[1]In the complaint, Plaintiffs refer to the letter as a "Notice to Quit Termination of Tenancy."  (Compl. ¶ 20.)  Elsewhere, Plaintiffs refer to this letter as an "eviction notice."  The letter was sent less than one month before the Millers's lease expired.  Neither party has informed the Court whether the Millers were allowed to reside at the Complex through the end of their lease, or whether the Millers were forced to leave the Complex before their lease expired. This difference is not material to the motions.

26. In August and September 2008, and again in February and May 2009, FHC sent testers to Clayborne Court. (ECF Nos. 93 and 94 "Tester Reports".) Elma Maye ("Maye"), the Director of Education and Enforcement for the FHC inquired about an apartment at Clayborne Court on May 14, 2009. (ECF No. 91-1 "Maye Report".) Each tester was interviewed by Hunt. (ECF No. 93-1 "Hughes Report" PgID 1071; ECF No. 93-2 "Reilly Report" PgID 1078; ECF No. 93-3 "Mark Report" PgID 1086; ECF No. 93-4 "Seals Report" PgID 1093; ECF No. 94-1 "Dwyer Report" PgID 1101; ECF No. 94-2 "Gordon Report" PgID 1108; ECF No. 94-3 "Moss Report" PgID 1117; Maye Report PgID 1030.)

27. Angel Hughes visited Clayborne Court on August 18, 2008. (Hughes Report PgID 1071.) Hunt told Angel Hughes that the Complex was marketed to an older crowd. (*Id.* PgID 1073.)

28. At his deposition, Hunt did not recall meeting with Hughes. (Hunt Dep. 29-30 PgID 1686-87.) Hunt testified that it was possible he told Hughes that the Complex is marketed to an older crowd. (*Id.* 30 PgID 1687.)

29. Lyric Reilly visited Clayborne Court on September 25, 2008. (Reilly Report PgID 1078.) Hunt told Reilly that the Complex was populated mostly by people in their mid-50s and, therefore, the Complex was very quiet. (*Id.* PgID 1080.)

30. Sue Mark visited Clayborne Court on February 13, 2009. (Mark Report PgID 1086.) Hunt told Mark that he likes to rent to people who are 55 years old and older. (*Id.* PgID 1088.)

31. At his deposition, Hunt could not recall any conversation with Mark. (Hunt Dep. 18-19 PgID 1684.)

32. Janine Seals visited Clayborne Court on February 18, 2009. (Seals Report PgID 1093.) Hunt told Seals that the Complex was marketed to adults 55 years or older. (*Id.* PgID 1095, 1098.)

9

33.  At his deposition, Hunt did not recall meeting with Seals or having any conversation with Seals.  (Hunt Dep. 15 PgID 1683.)

34.  Sherri Dwyer visited Clayborn Court on February 18, 2009.  (Dwyer Report PgID 1101.) Hunt told Dwyer that the Complex was marketed to people 55 years old and older.  (*Id.* PgID 1103, 1106.)

35.  Maye visited Clayborne Court on May 14, 2009.  (Maye Report PgiID 1030.)  Hunt told Maye that the Complex is marketed to 55 and older folks.  (*Id.* PgID 1035.)  Hunt explained that he cannot legally say the Complex is a senior place because the Complex does not meet some rule.  (*Id.*) Hunt also stated that he would not rent to roommates.  (*Id.*)

36.  At his deposition, Hunt denied that he ever told a prospective tenant that he would not permit college students to be roommates at the Complex.  (Hunt Dep. 10 PgID 1682.)  Hunt also could not recall any conversation with Maye.  (*Id.* 28 PgID 1686.)

37.  At his deposition, Hunt did not recall making the statement that he could not legally say that the Complex was a senior complex.  (Hunt Dep. 4 PgID 1680.)  Hunt testified that the statement was not inaccurate.  (*Id.* 5.)  Hunt also testified that the Complex was marketed to seniors, but not to seniors exclusively.  (*Id.*)

38.  Joseph Gordon visited Clayborne Court on May 18, 2009.  (Gordon Report PgID 1108.) Hunt told Gordon that the Complex does not allow roommates.  (*Id.* PgID 1112.)  Hunt also stated that there were no children at the Complex.  (*Id.*)

39.  At his deposition, Hunt could not recall either Gordon or whether he told Gordon that the Complex did not allow roommates.  (Hunt Dep. 13 PgID 1682.)

40.  Reuben Moss visited Clayborne Court on May 18, 2009.  (Moss Report PgID 1117.)

10

Hunt told Moss that the Complex was a quiet place for seniors to live.  (*Id.* 1122.)  Hunt said that the Complex does not allow pairing up of college students.  (*Id.*)  Hunt also said that, even though the Complex had two-bedroom units, there were no children.  (*Id.*)

41.  At his deposition, Hunt did not call ever telling Moss that the Complex was a quiet place for seniors.  (Hunt Dep. 9 PgID 1681.)

## II.  LEGAL FRAMEWORK

### A.  RULE 12(b)(6) MOTION TO DISMISS

Under the notice pleading requirements, a complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The court need not accept as true any legal conclusions couched as factual allegations.  *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949-1950 (2009).  To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide sufficient factual allegations that, if accepted as true, are sufficient to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, and the "claim to relief must be plausible on its face" *Id.* at 570.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Iqbal*, 129 S.Ct. at 1949 (citations omitted).  The Supreme Court offered some guiding principles for trial courts deciding motions to dismiss under this standard.

> In keeping with these principles a court considering a motion to dismiss can

choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 1950.

## B. RULE 56(c) MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Once the moving party has carried its burden, the nonmoving party must set forth specific facts in the record showing there is a genuine issue for trial. *Matsushita*, 475 U.S. at 574; *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010) ("After the moving party has met its burden, the burden shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 248)). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

### III.  FAIR HOUSING LAW

### A.  STANDING

Under Article III of the United States Constitution, federal courts are limited to adjudicating actual "cases" and "controversies."  *Allen v. Wright*, 468 U.S. 737, 750 (1984).  As part of the case and controversy requirement, a litigant must have standing to invoke the power of the federal court.  *Id.* at 750.  Standing encompasses judicially self-imposed components, or prudential components, as well as "a core component derived directly from the Constitution."  *Id.*  As part of the core constitutional component of standing, a plaintiff "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Id.* (citation omitted); *see Fair Hous. Council, Inc. v. Vill. of Olde St. Andrews, Inc.*, 210 F. App'x 469, 471 (6th Cir. 2006) ("To demonstrate standing under Article III, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.") (citations omitted).  In *Gladstone, Realtors v. Vill. of Bellwood*, the United States Supreme Court held that standing to sue under the FHA is "as broad as is permitted by Article III of the Constitution."  441 U.S. 91, 109 (1979); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 230 (6th Cir. 2003).

The Fair Housing Act ("FHA") authorizes "an aggrieved person [to] commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."  42 U.S.C. § 3613(a)(1)(A).  The FHA defines "aggrieved person" as any person who

> (1) claims to have been injured by a discriminatory housing practice; or
> (2) believes that such person will be injured by a discriminatory housing practice is
>     about to occur.

42 U.S.C. § 3602(i).  Accordingly, to establish standing under the FHA, "a plaintiff need only show that he or she (1) suffered an injury in fact, (2) that is causally connected to the defendants' conduct, and (3) that is likely to be redressed by a favorable ruling." *Hamad*, 328 F.3d at 230-31 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) and *DeBolt v. Espy*, 47 F.3d 777, 779-82 (6th Cir. 1995)).  Standing to sue under the FHA is as broad as the Constitution allows.  *See Fair Hous. Council,* 210 F. App'x at 472 ("With regard to the Fair Housing Act, Congress has made a decision to afford standing to all litigants withing the Constitutional limits.  As a result, the plaintiffs in the instant case need only satisfy Article III requirements in order to demonstrate standing.") (internal citations omitted); *Hamad*, 328 F.3d at 230 ("The Supreme Court has held, however, that standing to sue under the [Fair Housing] Act is 'as broad as is permitted by Article III of the Constitution.")  (quoting *Gladstone, Realtors*, 441 U.S. at 109).

## B.  FAIR HOUSING ACT - § 3604(a)

Under § 3604(a) of the FHA, persons are prohibited from refusing to rent after the making of a bona fide offer, or refusing to negotiate for the rental of, or otherwise refusing to make available a dwelling to another on the basis of race, color, . . . or familial status, . . . .  42 U.S.C. § 3604(a).  In 1988, Congress amended the FHA by adding the term "familial status" as a proscribed classification.  *See Hamad*, 328 F.3d at 233.  Congress expanded the FHA to protect families from discrimination "in light of an express concern for the plight of single-parent families, young families with children, and poor families." *United States v. Branella*, 972 F. Supp. 2d 294, 297 (D.N.J. 1997) (citations omitted).  The term "familial status" in the FHA is defined as

one or more individuals (who have not attained the age of 18 years) being domiciled with
(1) a parent or another person having legal custody of such individual or individuals;

14

            or

(2) the designee of such parent or other person having such custody, with the written
      permission of such parent or other person.

42 U.S.C. § 3602(k).

Ordinarily, a plaintiff with a section 3604(a) claim must show (1) he or she is a member of a protected group, (2) he or she applied for and was qualified to rent certain housing, (3) he or she was rejected, and (4) the housing remained available thereafter. *See Lindsay v. Yates*, 578 F.3d 407, 414 (6ht Cir. 2009). This first stage is flexible and was "never intended to be rigid, mechanical, or ritualistic." *Selden Apartments v. United States Dep't of Hous. and Urban Dev.*, 785 F.2d 152, 161 (6th Cir. 1986) (citation omitted). Where the plaintiff is not a member of a protected group, but does have standing under the FHA and does meet the definition of aggrieved person, courts have found that the plaintiff can meet the first prong of a prima facie case. *See Kennedy v. City of Zanesville, Ohio*, 505 F. Supp. 2d 456, 495 (S.D. Ohio 2007); *Landesman v. Keys Condo. Owners Ass'n*, No. C 04-2685, 2004 WL 2370638, at * 3 (C.D. Cal. Oct. 19, 2004); *Smith v. Mission Assoc. Ltd. P'ship*, 225 F. Supp. 2d 1293, 1299 (D. Kan. 2002).

A plaintiff may bring either a disparate treatment or a disparate impact claim under § 3604(a).[2] For disparate treatment claims under the FHA, a section 3604(a) claim is governed by the familiar evidentiary standard first outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lindsay*, 578 F.3d at 414; *Mencer v. Princeton Square Apartments*, 228 F.3d 631, 634 (6th Cir. 2000); *Selden Apartments*, 785 F.2d at 159; *see also Graoch Assocs. # 33, L.P. v.*

---

[2]A disparate treatment claim is a allegation of discriminatory intent where an individual is treated differently because of a protected characteristic, while a disparate impact claim is an allegation of a discriminatory effect where a facially neutral policy or practice has a discriminatory effect on a protected group. *Blaz v. Barberton Garden Apartment*, 972 F.2d 346, 1992 WL 180180, at * 3 (6th Cir. July 29, 1992) (unpublished table opinion) (per curiam).

*Louisville/Jefferson Cnty. Metro Human Relations Comm'n*, 508 F.3d 366, 371 (6th Cir. 2007)

(discussing the differences between the disparate treatment and disparate impact analyses).  Under

this three part burden-shifting framework, a plaintiff must first present a prima facie case of housing

discrimination.  *Lindsay*, 578 F.3d at 414.  That burden is minimal.  *See Bryson v. Regis Corp.*, 498

F.3d 561, 571 (6th Cir. 2007) (describing the burden at the first stage of the same burden-shifting

framework for an employment related discrimination claim).  If the plaintiff is successful, the burden

shifts to the defendant to proffer evidence of a legitimate, nondiscriminatory reason for the adverse

housing decision.  *Lindsay*, 578 F.3d at 414.  If the defendant produces such evidence, the burden

shifts back to the plaintiff to produce evidence from which the jury could conclude that the proffered

reason is merely a pretext for unlawful discrimination.  (*Id.*)  Ultimately, the plaintiff must show that

a discriminatory purpose was a motivating factor in the defendant's conduct.  *Smith & Lee Assocs.,*

*Inc. v. City of Taylor, Michigan*, 102 F.3d 781, 790 (6th Cir. 1996) (quoting *Vill. of Arlington*

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977)).  Under the FHA, a defendant's

benign motive does not prevent conduct or practice from being discriminatory on its face.  *See*

*Larkin v. Michigan Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996); *see also Hobson v.*

*George Humphreys, Inc.*, 563 F.Supp. 344, 352 (W.D. Tenn. 1982) (holding it is not always

necessary for the court to apply the burden-shifting analysis because, in some situations, proof of

discriminatory intent can be inferred from the mere fact of difference in treatment) (quoting

*Arlington Heights*, 429 U.S. at 267).

Under a disparate impact theory of discrimination under the FHA, a court should supplement

the third step of the burden-shifting framework.  *Graoch Assocs.*, 508 F.3d at 373.

To determine whether a defendant's proffered business reason is a pretext for

16

discrimination, or whether an alternative practice exists that would achieve the same business ends with a less discriminatory impact, we must consider the strength of the plaintiff's statistical evidence of disparate impact and the strength of the defendant's interest in maintaining the challenged practice.  Those are the first two *Arthur* [*v. City of Toledo*, 782 F.2d 565 (6th Cir. 1986)] factors.   The third *Arthur* factor, distinguishing defendants who wish only to stop others from providing housing, is not relevant to claims against private defendants, who lack the authority to control third-party behavior . . . .

*Id.*  The court clarified the *Arthur* standard as "a supplement, not an alternative, to the burden-shifting framework."  *Id.*

Borrowing from our Title VII cases, then, we hold that disparate-impact claims against private defendants under the FHA should be analyzed using a form of the *McDonnell Douglas* burden-shifting framework.
-First, a plaintiff must make a prima facie case of discrimination by "identifying and challenging a specific [housing] practice, and then show[ing] an adverse effect by offering statistical evidence of a kind or degree sufficient to show that the practice in question has caused the adverse effect in question." *Kovacevich* [*v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000)] (disparate impact claim under Title VII);
-Second, if the plaintiff makes a prima facie case, the defendant must offer a "legitimate business reason" for the challenged practice, *ibid.*;
-Third, if the defendant offers such a reason, the plaintiff must demonstrate that the defendant's reason is a "pretext for discrimination, or that there exists an alternative [housing] practice that would achieve the same business ends with a less discriminatory impact."  *Ibid.*   In order to evaluate the plaintiff's showing, we consider the strength of the plaintiff's showing of discriminatory effect against the strength of the defendant's interest in taking the challenged action.  *See Arthur* [*v. City of Toledo, Ohio*, 782 F.2d 565, 575 (6th Cir. 1986)] (disparate impact claim against a governmental defendant under the FHA.)

*Id.* at 375.

The FHA provides for certain specific exemptions from its prohibition on housing discrimination.  *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 n.4 (9th Cir. 2007).  The statute creates an exemption for housing for older persons under 42 U.S.C. § 3607(b)(2).  The exemption is an affirmative defense against the merits of a plaintiff's case.  *Hooker v. Weathers*, 990

17

F.2d 913, 915 (6th Cir. 1993).  The FHA provides specific criteria that must be met in order for property to qualify for the exemption.   42 U.S.C. § 3607(b)(2)(i)-(iii); *United States v. Fountainbleau Apartments. L.P.*, 566 F.Su pp. 2d 726, 734-35 (E.D. Tenn. 2008).  The Department of Housing and Urban Development has also issued regulations establishing further criteria that must be met to qualify for the exemption.  24 C.F.R. § 100.305; *see Fountainbleau*, 566 F. Supp. 2d at 735.

Defendants acknowledge that they do not qualify for the older person exemption.  (ECF No. 130-1 Def. Resp. 14.)

## C.  FAIR HOUSING ACT - § 3604(c)

Under section 3604(c) of the FHA, persons are prohibited from making or publishing statements or advertisements that "indicates any preference, limitation, or discrimination based on race, color, . . . [or] familial status . . . or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).  To establish a claim under § 3604(c), a plaintiff must prove three elements: (1) the defendant made a statement, (2) the statement was made with respect to the sale or rental of a dwelling, and (3) the statement indicates a preference, or limitation, or discrimination based on a protected class.  *See Campbell v. Robb*, 162 F. App'x 460, 466-67 (6th Cir. 2006).  The allegedly discriminatory statement can be either written or oral.  *Id.* at 466 (citations omitted).

When examining a §3604(c) claim, courts should apply the "ordinary reader" standard to determine what has been "indicated" by an advertisement.  *See Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991); *see also Jancik v. Dep't of Hous. and Urban Dev.*, 44 F.3d 553, 556 (7th Cir. 1995) ("[E]very circuit court that has considered a claim

18

under section 3604(c) has held that an objective 'ordinary reader' standard should be applied.") (citations omitted). A statement is made with respect to a dwelling "only if it related to the decision of whether or not to sell or rent the property; a 'stray remark' wholly 'unrelated to the decisional process' is not actionable under § 3604(c)." *Campbell*, 162 F. App'x at 467 (citations omitted). The word "indicates" means that, to the ordinary reader, the statement "suggests" a preference against renting to a protected category. *See Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991). An advertisement or statement contains a preference against renting to a protected group when the ad "would discourage an ordinary reader of a particular [protected group] from answering it." *Id.* at 999-1000. An "ordinary reader" is "neither the most suspicious nor the most intensive of our citizenry." *Id.* at 1002. A plaintiff need not establish an intent to discriminate in order to establish a violation of § 3604(c) using the "ordinary reader" standard. *Housing Opportunities*, 943 F.2d at 646; *see Jancik*, 44 F.3d at 556; *Ragin*, 923 F.2d at 1000.

When reviewing advertisements under § 3604(c), "[a]n advertisement must be considered in its totality." *Housing Opportunities*, 943 F.2d at 648 n.2. *Housing Opportunities* questioned whether the use of all almost exclusively white models in published real estate advertisements over a twenty-year period could constitute discrimination under § 3604(c). The court rejected the apparent suggestion of the dissent that, in reviewing the ads, the court should look only at the models, and not at any of the other words and symbols in the ads. *Id.* 648 n.2.

Defendants argue that this Court must review their entire advertising campaign, and not focus on any one particular ad, citing *Miami Valley Fair Hous. Ctr., Inc. v. Connor Group*, 805 F. Supp. 2d 396, 411 (S.D. Ohio 2011) (citing *Tyus v. Urban Search Mgt.*, 102 F.3d 256, 264-65 (7th Cir. 1996) and *Ragin*, 923 F.2d at 1002). The Court finds no legal authority supporting such proposition.

19

Neither the FHA nor Michigan's statute requires a court examine an entire advertising campaign. No circuit court has reached the holding Defendants propose.  In *Ragin*, one of the cases cited by *Miami Valley*, the complaint alleged that the pattern of models depicted in advertisements over a twenty-year period constituted a violation of the FHA.  *Ragin*, 923 F.2d at 998-999.  In *Tyus*, the other case cited by *Miami Valley*, the plaintiffs also alleged that the advertising campaign, over three years, used almost exclusively white models, in violation of the FHA.  *Tyus*, 102 F.3d at 260-61.

Defendants' theory finds some support in *Housing Opportunities*, a Sixth Circuit case. Similar to the plaintiffs in *Tyus* and *Ragin*, in *Housing Opportunities* the plaintiff alleged that the ad campaign, in its aggregate, by using almost exclusively white models, violated the FHA.  *Housing Opportunities*, 943 F.2d at 646 n.1 ("It should be noted that HOME did not brief the issues related to a possible discriminatory message arising from the use of white models in a single advertisement. Its entire brief is devoted to a discriminatory message from an aggregate of advertisers.").  The trial court granted the defendant's motion to dismiss, and the plaintiff appealed.  Despite the observation in the first footnote of the opinion quoted just earlier, the circuit court described the plaintiff's first claim as alleging "that a single advertisement depicting all-white models is sufficient to create a cause of action under section 3604(c)."[3]  The court rejected that claim, concluding "that a complaint alleging a violation of section 3604(c) based on a single publication of an advertisement which uses a small number of all white models does not, without more, state a cognizable claim under section 3604(c) as a matter of law."[4]  *Id.* at 648.  The majority noted that the holding was not a per se rule,

_____

[3]The majority concluded the plaintiff was alleging discrimination in a single ad based on an answer counsel provided during oral argument.  *Housing Opportunies*, 943 F.2d at 648 n.4.

[4]A trial court in this circuit, faced with a similar claim based on the use of models, would likely follow the holding.  That said, based on the court's first footnote, it is unclear whether this

and left open the possibility that a single ad could give rise to a § 3604(c) claim.  *Id.* 647 n.4.

The Court does not find the holdings in *Ragin*, *Tyus*, and *Housing Opportunities* applicable to the claims raised here.  The holdings in those three cases may be fairly read as addressing the use of models in advertisements.  Nothing in the opinions suggests the same standard is true for the words used in an advertisement.  Therefore, the claims here are readily distinguishable from the claims raised in *Tyus*, *Ragin*, and *Housing Opportunities*.  Obviously, a familial status discrimination claim premised on the use of the words "no children allowed" in a single ad would be evaluated differently from a familial status discrimination claim premised on a series of ads featuring only adult models.

Section 3604(c) claims are not analyzed under the burden-shifting paradigm.  *Pack v. Fort Washington II*, 689 F. Supp. 2d 1237, 1245 (E.D. Cal. 2009); *see Housing Opportunities*, 943 F.2d at 646-47 (discussing the ordinary reader standard); *Campbell*, 162 F. App'x at 466-67 (using the ordinary reader standard); *see also Soules v. Dep't of Hous. and Urban Dev.*, 967 F.2d 817, 822-824 (2d Cir. 1992) (analyzing the section 3604(a) claim under the burden shifting framework and the section 3604(c) claim under the ordinary reader standard).  In *Housing Opportunities* the circuit court examined allegedly discriminatory advertisements under the "ordinary reader" standard.  In *Campbell*, 162 F. App'x at 466, the circuit court individually examined each of three allegedly discriminatory statements made by the defendant.  In neither case did the Sixth Circuit analyze the § 3604(c) claim under the burden-shifting framework.

Federal courts have had the many opportunities to determine whether various statements by

---

holding is binding or dicta.  The plaintiff did not brief, or apparently defend, the claim the court rejected.

landlords violate § 3604(c). When an advertisement or statement expresses a preference to not rent to families with small children, section 3604(c) is violated. *See, e.g., Fair Hous. Congress v. Weber*, 993 F. Supp. 1286, 1293 (C.D. Cal. 1997) (involving a landlord who had an informal policy of not renting second floor apartments with balconies to families with small children and who made statements that such families should only rent first floor apartments."); *United States v. Grishman*, 818 F. Supp. 21, 23 (D.Me. 1993) (involving a defendant who told his rental agents that, "although they were not to exclude families with suitable children, 'the property [was] more suited to people without children.'"). When a landlord's policy or rule contains a restriction that would limit rentals to families with children, section 3604(c) is violated. *See, e.g., Williams v. American Homestead Mgt.*, No. 4:04-cv-56, 2005 WL 1118118, at * (W.D. Mich. May 11, 2005) (Quist, J.) (explaining, in an opinion regarding damages, that the defendant liability arose because he admitted he "adopted a policy against renting a one-bedroom apartment to an adult and a minor," which was supported by sincere and good intentions, but nevertheless violated the plaintiff's federally protected rights); *Reeves v. Rose*, 108 F. Supp. 2d 720, 727 (E.D. Mich. 2000) (finding a material question of fact whether the defendant's statement that only one child per apartment was allowed constituted a discriminatory statement on the basis of family status); *Blomgren v. Ogle*, 850 F. Supp. 1427, 1440 (E.D. Wash. 1993) (involving a written policy for an apartment building that stated "no children (other than visiting) or pets"); *United States v. LaPore*, 816 F. Supp. 1011, 1024 (M.D. Pa. 1991) (involving a two-person occupancy limitation for a mobile home where the limitation was designed to exclude families with children from living in the community). At least one court has held that when an advertisement or statement expresses a preference for adults or more mature persons, section 3604(c)'s prohibition on familial status discrimination is violated. *See, e.g., Jancik*, 44 F.3d

22

at 556 (involving a defendant who stated he did not want families with children in the building and an advertisement that stated a preference for a "mature person").

### D.  42 U.S.C. § 1982

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.  42 U.S.C. § 1982.  A plaintiff need not be a person of color to raise a claim under § 1982.  *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236-37 (1969).  The elements of a claim under § 1982 are generally the same as the elements for a claim under the Fair Housing Act.  *Selden Apartments*, 785 F.2d at 159 (collecting cases).

### E.  MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT

Michigan's Elliot-Larsen Civil Rights Act ("ELCRA") prohibits race, color, age and family status discrimination in real estate transactions.  Mich. Comp. Laws § 37.2502(1).  Subsection (1)(a) prohibits a person from refusing to engage in a real estate transaction with another person for discriminatory reasons.  Mich. Comp. Laws § 37.2502(1)(a).  Subsection (1)(b) prohibits a person from discriminating in the terms, conditions, or privileges of a real estate transaction.  Mich. Comp. Laws. § 37.2502(1)(b).  With respect to the various protected classes identified, subsection (1)(f) of the statute prohibits individuals from making and printing statements and advertisements for a real estate transaction "which indicates, directly or indirectly, an intent to make a preference, limitation, specification, or discrimination with respect to the real estate transaction."  Mich. Comp. Laws § 37.2502(1)(f).  Because Michigan's statute is analogous to federal housing discrimination statutes, federal courts interpreting the Michigan statute have relied on federal law for guidance.  *Mencer*, 228 F.3d at 635; *Kinde v. Goschinski*, No. 09-10131, 2010 WL 779288, at * 5 (E.D. Mich. Mar. 8, 2010).

## IV.  CLAIMS IN THE COMPLAINT

The Court finds it useful, at this point, to attempt to identify the claims in the complaint.  For the purpose of the counts in the complaint, the complaint does not distinguish between the Millers and FHC, or between any of the four Defendants.  In fact, the counts in the complaint are written as succinctly, and in the most generic terms, possible.  In Count 1, the complaint asserts that Defendants have discriminated against Plaintiffs on the basis of Plaintiffs' race and familial status in violation of the FHA, § 3604(a) and § 3604(c).  (Compl. ¶¶ 30-32.)  In Count 2, the complaint asserts Defendants have committed unlawful acts of discrimination based on race or color against Plaintiffs in violation of 42 U.S.C. § 1982.  (Compl. ¶¶33-34.)  In Count 3, the complaint asserts Defendants have discriminated against Plaintiffs and committed unlawful housing practices on the basis of race, age, and familial status in violation of the Elliot-Larsen Civil Rights Act, § 37.2501(1)(a)-(d) and (f).

The Millers and FHC thus assert claims for age, race, and familial status housing discrimination that require analysis under the burden-shifting scheme.  The Millers's and FHC's familial status discrimination claims, that require analysis under the burden-shifting scheme, arise under the FHA § 3604(a) and the ELCRA § 37.2502(1)(a) and (b).  Here, Plaintiffs reason that when Defendants favor renting to seniors, they necessarily discriminate against families.  The Millers's and FHC's race discrimination claims, that require analysis under the burden-shifting scheme, arise under the FHA § 3604(a), the ELCRA § 37.2502(1)(a) and (b), and 42 U.S.C. § 1982.  Here, Plaintiffs reason that discrimination against families has a bigger effect on racial minorities than on Caucasian renters.  (ECF No. 123 Pl. Resp. to Def. Sec. Mot. 2.)  The Millers's and FHC's age discrimination claims, that require analysis under the burden-shifting scheme, arise under the

ELCRA § 37.2502(1)(a) and (b).  Plaintiffs argue Defendants discriminate by favoring seniors.

The Millers and FHC also assert claims for age, race, and familial status housing discrimination that requires analysis under the ordinary reader standard.  The Millers's and FHC's familial status discrimination claim, that require analysis under the ordinary reader standard, arise under the FHA § 3604(c) and the ELCRA § 37.2502(1)(f).  Here, Plaintiffs reason that when Defendants indicate a preference for seniors, they discriminate against families.  The Millers's and FHC's race discrimination claims, that require analysis under the ordinary reader standard, arise under the FHA § 3604(c) and the ELCRA § 37.2502(1)(f).  The Millers's and FHC's age discrimination claims, that require analysis under the ordinary reader standard, arise under the ELCRA § 37.2502(1)(f).  Plaintiffs argue Defendants have indicated a preference for seniors.

## V.  DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 86)

Although titled as a motion for summary judgment, Defendants bring their first motion under both Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure.  In this first motion, Defendants challenge whether either the Millers or the FHC can establish a familial discrimination claim under the Fair Housing Act.  Defendants question whether the Millers have standing to raise a familial status discrimination claim, which would affect both their claims analyzed under the burden-shifting scheme and the claims analyzed under the ordinary reader standard.  Defendants further question whether the Millers, or any tester, were ever denied an apartment on the basis of their familial status.

### A.  THE MILLERS

Defendants argue the Millers have never had legal custody of their grandchildren. Defendants reason that, as a result, the Millers cannot meet the statutory definition of familial status.

*See* 42 U.S.C. § 3602(k).  Defendants conclude that the Millers have not pled and cannot establish a claim for familial status housing discrimination.

The Millers familial status discrimination claims are based on two facts: (1) the denial of a two-bedroom apartment, and (2) the failure to renew their lease when it expired in 2008.  (ECF No. 205 Hrg. Trans. PgID 3461.)  The Millers make no claims about any injury arising from the lack of other families at Clayborne Court.  (*Id.* PgID 3468-69.)

### 1.  Rule 12(b)(6) - Allegations in the Complaint

In the complaint, the Millers allege that they requested a two-bedroom apartment, in order to accommodate their grandchildren.  (Compl. ¶ 15.)  The Millers also allege they were told they would not get a two-bedroom apartment because their grandchildren would probably move in with them.  (*Id.* ¶ 16.)  In August 2008, the Millers were sent a letter ending their lease due in part to the Complex being marketed to an older clientele.  (Compl. ¶ 20.)

Under the FHA, an individual has standing to sue for discrimination when he or she is a member of the community against which it is alleged that the defendant directed his or her discriminatory practices.  *See Gladstone*, 441 U.S. at 112 ("Noting the importance of the 'benefits of interracial associations,' and in keeping with the Court's recent statement that noneconomic injuries may be sufficient to provide standing, we concluded that this injury was sufficient to satisfy the constitutional standing requirement of actual or threatened harm" for the four plaintiffs who resided in the Bellwood community.) (internal citations omitted); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211-12 (1972) ("The person on the landlord's blacklist is not the only victim of discriminatory housing practices; it is, as Senator Javits said in supporting the bill, 'the whole community.' . . . We can give vitality to § 810(a) only by a generous construction which gives

26

standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute."); *Hamad*, 328 F.3d at 232 ("[S]tanding depends on whether one is a member of the community in which allegedly unlawful discrimination is taking place."); *see also Wasserman v. Three Seasons Ass'n No. 1, Inc.*, 998 F. Supp. 1445, 1446-47 (S.D. Fla. 1998) (discussing the Supreme Court's holdings concerning the standing for "aggrieved persons" under the FHA.)

Defendants are not entitled to dismissal of the Millers's familial status discrimination claims. Taking the allegations in the complaint as true, the Millers have alleged sufficient facts to state a claim for familial status discrimination related to the denial of a two-bedroom apartment.  For the purpose of the Millers's discrimination claims arising from the denial of a two-bedroom apartment, the Millers are aggrieved persons under the FHA, they have standing to sue, and can meet the first element for a housing discrimination claim that requires a burden-shifting analysis.  The Sixth Circuit, in two separate published opinions, has found standing to sue under the FHA for familial status discrimination, even where the plaintiffs did not have legal custody of the minors who would be residing with the plaintiffs.  *See Hamad*, 328 F.3d at 231 ("Joyella has standing to challenge Woodcrest's bylaws, which facially discriminate on the basis of familial status, because they adversely affect her desire to have her teenage nephew move in with her . . . ."); *Hooker*, 990 F.2d at 915 (finding standing to sue where, among other things,  the plaintiff stated in an affidavit that "the defendants refused to allow the Hooker family to move into the trailer with their minor grandchildren.").  Under the FHA § 3604(a) and the ELCRA § 37.2502(1)(a) and (b), the alleged denial of a two-bedroom apartment on the basis of their grandchildren would constitute sufficient facts to establish standing and the first element of a claim under either statute.  Similarly, under the

FHA § 3604(c) and ELCRA § 37.2502(1)(f), the alleged statement by Hunt would constitute sufficient facts to state a claim under the ordinary reader standard.

The Millers have also alleged sufficient facts to state a claim for familial status discrimination on the basis of the termination of their lease. The complaint alleges that the Millers's were being evicted, in part, because the apartments were being marketed to an older clientele. It is plausible, and more than speculative, that by marketing to an older clientele, Defendants were discouraging families from renting apartments. By not renewing the Millers's lease, Defendants assured that the Millers's grandchildren would not be in the Complex, either visiting or living. Those fact, taken as true, do state a claim for housing discrimination on the basis of familial status under FHA § 3604(a) and ELCRA § 37.2502(1)(a) and (b). As a written statement, the letter constitutes a claim under FHA § 3604(c) and ELCRA § 37.2502(1)(f) under the ordinary reader standard.

### 2. Rule 56(c) - Facts in the Record

Taking the facts in the record in the light most favorable to the Millers, Defendants are not entitled to summary judgment on the Millers's claims for familial status discrimination for the denial of a two-bedroom apartment. The record establishes that the Millers asked to move into a two-bedroom apartment. (Factual Allegations in the Record ¶ 15.) The record also establishes that Hunt kept a list of individuals who wanted to move into two-bedroom apartments. (*Id.* ¶ 10.) The record supports the conclusion that two-bedroom apartments became available during the Miller's second tenancy with the Complex, but were not offered to them.[5] (ECF No. 110-1 2004-2010 Clayborne

---

[5]This exhibit was filed as an attachment supporting Plaintiffs' motion for summary judgment. Counsel for Plaintiffs referred to this exhibit during oral argument on Defendants' motion for partial summary judgment. (Trans. 03/14/11 Hrg. PgID 3459, 3466.)

Court Apartment "Tenant File Review" PgID 1334-56.)  At oral argument, Defendants argue that the record does not establish that the two-bedroom apartments became available when the Millers were at the top of the waiting list.  Plaintiffs pointed out that some of the individuals who were given two-bedroom apartments did not apply to live in the Complex until after the Millers started their 2006 lease.  From this evidence, a reasonable person can infer that the Millers were bypassed and two-bedroom apartments were rented to someone else.  This inference, coupled with Hunt's statement to Teresa Miller about not giving a two-bedroom apartment to the Millers because of their grandchildren, is sufficient to create a genuine issue of material fact and deny Defendants' motion for summary judgment on all the Millers's claims for familial status discrimination related to the two-bedroom apartment.

Defendants, however, are entitled to summary judgment on the Millers's familial status claim under FHA § 3604(a) and ELCRA § 37.2502(1)(a) and (b) arising from the failure to renew their lease.  For the purpose of this claim, the Court assumes the facts pled in the complaint are sufficient, and that the record supports the Millers's ability to establish a prima facie case.  Taking the facts in the light most favorable to Plaintiffs, Defendants have established a legitimate, nondiscriminatory reason for the decision not to renew the Millers's lease.  The August letter begins by referencing "unfortunate occurrences." (Factual Allegations in the Record ¶ 23.)  On two occasions in 2008, the police responded to calls about alleged assaults by the Millers.  (*Id.* ¶¶ 20 and 22.)  The second occasion involved an assault on Hunt by Ken Miller.  (*Id.* ¶ 22.)  An alleged assault on the manager of the complex constitutes a legitimate, nondiscriminatory reason not to renew a lease.  Plaintiffs have not established that this reason is pretext for familial status discrimination.

Defendants are not entitled to summary judgment on the Millers's familial status

29

discrimination claim under FHA § 3604(c) and ECLRA § 37.2502(1)(f).  The Millers's claim for familial status discrimination under FHA § 3604(c) and ELCRA § 37.2502(1)(f), arising from the 08/08 letter, is not evaluated under the burden-shifting framework.  The record, taken in the light most favorable to Plaintiffs, establishes the elements of a claim.  The letter is a written statement made with respect the rental of a dwelling and the letter suggests a preference against renting to families.

## B.  FAIR HOUSING CENTER

Defendants imply that FHC does not have standing to raise a familial status discrimination claim.  Defendants argue that complaint does not allege that any tester presented himself or herself as a member of a family seeking to rent an apartment.  Defendants argue the complaint does not allege that any tester was ever denied an opportunity to rent an apartment as the result of the tester's familial status.  In their response to this motion, Plaintiffs suggest the FHC's familial status discrimination claims are based on (1) the ads and statements made by Defendants about seniors and (2) the Tenant Selection Criteria.

### 1.  Rule 12(b)(6) - Allegations in the Complaint

A fair housing center has standing to sue under the FHA if it alleges it has "such a personal stake in the outcome of the controversy as to warrant invocation of federal court jurisdiction." *Havens Realty Corp.*, 455 U.S. at 378-79 (citation omitted).  In *Havens Realty*, the plaintiff association alleged in the complaint that the defendant's racial steering practices frustrated the plaintiff association's "efforts to assist equal access to housing through counseling and other referral services." *Id.* at 379.  Furthermore, the plaintiff association had "devoted significant resources" to identify and counteract the racial steering practices. *Id.*  The Court found

30

> as broadly alleged, [the defendants'] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities - with the consequent drain on the organization's resources, constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379. The Sixth Circuit has held where a fair housing center has incurred costs related to prelitigation investigations, the association has standing under the FHA. *Fair Hous. Council*, 210 F. App'x at 475 (citing *Housing Opportunities*, 943 F.2d at 646 and *Hooker,* 990 F.2d at 915); *see Hughes v. Peshina*, 96 F. App'x 272, 273 (6th Cir. 2004) (per curiam) ("Here, FHCS devoted its efforts to investigating whether LJP and the Peshinas had violated the law, thus diverting its resources away from other housing services it provides and frustrating its mission of insuring fair housing practices. It has thus alleged a distinct and palpable injury and has sufficiently established its standing.").

FHC has standing to sue Defendants for familial status discrimination. The complaint alleges that Teresa Miller reported alleged violations of fair housing laws by Hunt at the Complex. (Compl. ¶19.) The complaint alleges that FHC investigated Clayborne Court as the result Teresa Miller's reports. (*Id.* ¶23.) The complaint establishes that FHC expended resources investigating Clayborne Court. (*Id.* ¶¶ 24-27.) Under the law of this circuit, by incurring costs associated with the investigation of alleged housing discrimination, FHC has standing to bring this suit against Defendants. Whether Defendants ever discriminated against the testers is not essential to FHC's standing.

Defendants are not entitled to dismissal of FHC's familial status claims under FHA § 3604(a) and (c) and ELCRA § 37.2502(1)(a), (b), and (f). Plaintiffs placed Defendants on notice, through

their response, that FHC would assert familial status claims under FHA § 3604(a) and (c) and ELCRA § 27.2502(1)(a), (b), and (f) based on the ads, statements, and Tenant Selection Criteria. (ECF No. 90.) In their response, Plaintiffs discuss ads, statements, and the Tenant Selection Criteria. Plaintiffs also cite case law concerning the similar claims raised under both FHA § 3604(a) and (c). FHC has pled sufficient facts to support a claim above the speculative leave. The Tenant Selection Criteria functions to deny apartments to families with children. The ads and other statements were made with respect to the rental of a dwelling. The ads and other statements express a preference for seniors, and therefore may also express a desire not to rent to families.

### 2. Rule 56 - Facts in the Record

Defendants are not entitled to summary judgment on FHC's claims for familial status discrimination under FHA § 3604(a) and (c) and ELCRA § 37.2502(1)(a), (b), and (f). Taking the evidence in the record in the light most favorable to Plaintiffs, the ads, statements to testers, and the Tenant Selection Criteria are written statements, made with respect to the rental of apartments at the Complex, and suggest a preference for seniors. There exists a dispute of material fact whether the ads, statements, and Tenant Selection Criteria suggest a preference for seniors that would discourage families from seeking to rent an apartment.

### VI.  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF No. 105)

Plaintiffs seek summary judgment on their (1) familial status discrimination claims under § FHA 3604(a) and ELCRA § 37.2502(1)(a) and (b), (2) familial status discrimination claims under FHA § 3604(c) and ELCRA § 37.2502(1)(f), and (3) age discrimination claims under ELCRA §

37.2502(1)(a), (b), and (f).[6]  Plaintiffs argue the various advertisements, the Tenant Selection Criteria, and the 08/08 letter all violate FHA § 3604(c) and ELCRA § 37.2502(1)(f).  Plaintiffs argue the Tenant Selection Criteria and waiting list violate FHA § 3604(a) and ELCRA § 37.2502(1)(a) and (b).

Plaintiffs identify specific advertisements and statements by Defendants as discriminating against families.  To the extent that any ad or statement discriminates against families, Plaintiffs' reason the ads also discriminate on the basis of age.  By expressing a preference for seniors, Plaintiffs' assert the ads and statements violate Michigan's prohibition on age discrimination.

### A.  "SENIOR FRIENDLY"

Plaintiffs argue Defendants use of the phrase "Senior Friendly" is discriminatory.  (Factual Allegations ¶¶ 2-4.)  Defendants do not deny the use of the phrase "Senior Friendly" in their advertisements.  Instead, Defendants explain that they market the Complex to a variety of groups, including seniors, as well as college students.  (Hunt Dep. 15 PgID 1683.)

Plaintiffs are not entitled to summary judgment on their § 3604(c) and § 37.2502(1)(f) claims arising from Defendants use of the phrase "Senior Friendly."  There is no genuine issue of material fact that Defendants used that phrase in several ads and on a banner.  No court has concluded, as a matter of law, that the phrase "Senior Friendly," or any similar phrase, under the ordinary reader standard, would discourage younger people or families from seeking to rent an apartment from Defendants.  One reasonable interpretation of the phrase would find the word "friendly" as suggesting inclusion, rather than exclusion.  The ordinary reader would not necessarily interpret an

---

[6]Generally, Plaintiffs have not distinguished between the Millers and FHC for the purpose of these claims.  Plaintiffs do indicate that their § 3604(c) and § 37.2502(1)(f) claim arising from the 08/08 letter to the Millers is a claim brought by the Millers.

attempt to entice seniors to the Complex as a coordinated attempt to dissuade families from residing at the Complex.  This is not to say that the use of the word "friendly" could not be used in a manner to express an unlawful preference.  Plaintiffs have simply not established that there exists no genuine issue of material fact that the use of the phrase "Senior Friendly" expresses an unlawful preference that the ordinary reader would understand.

### B.  "DESIGNED JUST FOR YOU"

Plaintiffs argue Defendants' use of the phrase "designed just for you" is discriminatory.  (Factual Allegations in the Record ¶¶ 5-6.)  In the radio spot, the flyer, and in one advertisement run in the Kalamazoo Gazette on February 18, 2006, Defendants used the word "Seniors" just prior to the phrase "designed just for you."  Defendants also used this phrase without any preceding reference to a protected group.  (ECF No. 112-1 PgID 1420 and ECF No. 113-1 PgID 1423-24.)  In those ads, however, the Complex also used the phrase "Seniors, you will love it here."  (*Id.*)  Defendants argue the radio spot ran very few times and drew attention to the layout of the Complex and the apartments.  Defendants argue that they have used the phrase "designed just for you" in a number of printed ads that make no reference to seniors or any other protected group.  (ECF No. 114-1 PgID 1498-1500, 1508-09.)  Defendants argue that they have flyers that market the Complex to students.[7]

Plaintiffs are not entitled to summary judgment on their § 3604(c) and § 37.2502(1)(f) claims arising from the "designed just for you" advertisements.  There is no genuine issue of material fact that Defendants used that phrase in conjunction with the word "seniors."  Plaintiffs ignore the requirement that the entire ad be examined.  *See Housing Opportunities*, 943 F.2d at 648 n.2.

---

[7]Defendants refer to Maye's narrative statement.  (ECF No. 130-3 PgID 2434.)  In that statement, Maye wrote that she "noticed another flyer that said Students."  (*Id.*)  Exactly how the word "students" was used in the flyer is not included in Maye's statements.

Immediately after the phrase "designed just for you," the ad lists the design features of the apartment, such as single story, a private entrance, a fenced patio, on-site maintenance, etc.[8]  (ECF No. 108-2 PgID 1307; ECF No. 112-1 PgID 1419.)  There exists a genuine issue of material fact whether the ordinary reader would interpret the ad as discouraging younger people or families from seeking to rent the apartment.  The ads market the features and amenities of the apartment, design features that would likely appeal to seniors.  The ordinary reader could find that those design features might be actively sought by groups other than seniors.  Indeed, families with small children might seek a single-story apartment with a private entrance and a fenced patio.  As noted in *Miami Valley*, "*the focus of the message is the suitability of the property to the renter – not the acceptability of the renter to the owner.*"  *Miami Valley*, 805 F. Supp. at 409 (emphasis added in *Miami Valley*) (quoting *Metro. Milwaukee Fair Hous. Council v. Labor and Indus. Review Comm'n.*, 496 N.W. 2d 159, 162 (Wis. Ct. App. 1992)).  Although no court has been asked to interpret this particular language in the context of the FHA, the language is different from the phrase "mature person preferred" in *Jancik*, which clearly expresses the acceptability of a renter to the owner.  By comparison, the advertisements that use the phrase "designed just for you," and list features of the apartment, do not express any unlawful preference for a particular renter.

## C.  "SENIOR RENT" CLASSIFIEDS AND MARKETING IN SENIOR SERVICES PUBLICATIONS

Plaintiffs argue the Defendants' advertisements in the "Senior Rent" portion of the Kalamazoo Gazette is discriminatory.  (Factual Allegations in the Record ¶ 7.)  Plaintiffs argue the Complex does not qualify for the FHA's older person housing exemption.  Plaintiffs insist that any

---

[8]The radio ad lists similar features.  (ECF No. 116.)

housing must qualify for the exemption in order to advertise in the "Senior Rent" section of the Gazette's classified ads.  Defendants argue they place ads on a rotating basis in different portions of the Gazette's classified ads.  (ECF No. 108-1 PgID 1300-05.)  Defendants contend that there is no evidence in the record to establish that housing must qualify for the FHA's older person housing exemption in order to advertize in the "Senior Rent" section of the Gazette's classified ads.

Plaintiffs argue the advertisement in the Senior Services publication is discriminatory. (Factual Allegations in the Record ¶ 8.)  Plaintiffs reason that Hunt completed an application for the publication where he labeled the Complex as Senior Housing.  Defendants point out that the publication only offered three options in their housing section: senior housing - subsidized, senior housing - non subsidized, and housing related issues.  Hunt checked the last two options. Defendants argue that the other apartment complexes advertized in the publication do not fall under the FHA's senior housing exemption.[9]

Plaintiffs are not entitled to summary judgment on their § 3604(c) and § 37.2502(1)(f) claims arising from Defendants' advertisements in the "Senior Rent" portion of the Kalamazoo Gazette classifieds or the Senior Services publication.  There is no genuine issue of material fact that Defendants placed ads in these two locations.  On these two claims, Plaintiffs make no argument that the words used in the advertisements are discriminatory.  Rather, Plaintiffs argue that the location of the advertisements constitutes discrimination.  No court has concluded, as a matter of law, that the choice of medium can render an otherwise innocuous advertisement into a violation of housing discrimination laws.  Defendants are correct that Plaintiffs have not established that housing must qualify for the FHA's holder person exemption in order to advertise in the senior section of the

---

[9]Defendants offer no evidence to support this assertion.

classifieds or in the Senior Services publication.  Such evidence might support Plaintiffs' claim.  The lack of evidence, however, does not necessarily defeat the claim.  There remains a genuine issue of material fact whether the ordinary reader would interpret placement of these advertisements in these locations as expressing a preference for seniors and thus discouraging families from seeking to rent an apartment from Defendants.

### D.  "MARKETED TO 55 AND OLDER"

Plaintiffs argue Hunt told several testers that the Complex was marketed to individuals 55 and older.  (Factual Allegations in the Record ¶¶ 29, 32, 34, and 35.)  Plaintiffs argue that those statements are discriminatory.  Defendants assert that the statements cited by Plaintiffs are taken out of context.  Defendant argues that saying "we market to 55 and older" is not a violation of the statute.  Defendant argues that Hunt testified that the Complex is marketed to people of all ages.[10]

Plaintiffs are not entitled to summary judgment on their § 3604(c) and § 37.2502(1)(f) claims arising from Hunt's statements that the Complex is marketed to people aged 55 years and older.  There is no genuine issue of material fact that Hunt told testers that the Complex was marketed to people aged 55 year and older.  Hunt never denied making these statements.  In fact, Hunt confirmed that the statement was not inaccurate.  (Factual Allegations in the Record ¶ 37.)  No court has held that, as a matter of law, the statement "we market to 55 and older," or something similar, under the ordinary reader standard, would discourage younger people or families from seeking to rent an apartment.  A genuine issue of material fact exists whether the ordinary reader would interpret such aphrase as discouraging younger people or families from seeking to rent an apartment from

---

[10]Defendants refer the Court to pages 423 and 424 of Hunt's deposition.  Those pages are not included in any exhibit attached to Defendants' response.  The Court has not located those pages of Hunt's deposition as part of any exhibit submitted in any of these motions.

Defendants. The ordinary reader could reasonably interpret the statement as indicating that Defendants advertise in particular publications. The ordinary reader could also reasonably interpret the statement as one explaining the demographics of the Complex. It is also possible that the ordinary ready could interpret the statement as one expressing a preference for older persons.

## E. TENANT SELECTION CRITERIA

Plaintiffs argue the Tenant Section Criteria discriminates against families.[11] [12] (Factual Allegations in the Record ¶ 9.) Plaintiffs reason the Tenant Selection Criteria allows Defendants to deny a studio or one-bedroom apartment to a single parent with a child, and also to deny any apartment to a family with more than one child. Plaintiffs point out that, according to the Tenant File Review, no family with more than one child has rented an apartment at Clayborne Court since 2004. (Tenant File Review.) Defendants argue that both Dooge and Hunt have denied that the document is an occupancy policy.[13] (Def. Resp. 12.) Defendants argue the document does not discriminate, rather it reserves the right for Defendants to deny residency in order to remain in

---

[11]Plaintiffs refer to the document as Defendants' Occupancy Policy. The Court will refer to the document by its title, "Tenant Selection Criteria."

[12]Plaintiffs have not argued that the Tenant Selection Criteria discriminates on the basis of age. Grandparents are more frequently raising grandchildren, *see Hooker*, 990 F.2d at 915, and the Tenant Selection Criteria would affect multigenerational families as much as nuclear families.

[13]Defendants neglect to cite any portion of the record for this assertion. Defendants do refer to their responses to Plaintiff's First Request for Production of Documents on December 2, 2009, but did not attach the document to their response. Plaintiffs include Defendants' discovery response as an attachment to their reply brief. (ECF No. 137-1 PgID 2593-2600.) As request no. 4, Plaintiffs asked Defendants for copies of all policies and procedures governing the rental of apartments at Clayborne Court. (*Id.* PgID 2595.) Defendants' replied "Notwithstanding the objection, there are no written 'policies and/or procedures . . . that govern the rental of apartments at Clayborne Court. The Apartments do utilize tenant selection criteria, a copy of which is attached to this Request as Exhibit 4." (*Id.*)

compliance with local occupancy codes.

Defendants argue Hunt testified at his deposition that two people are allowed to reside in studio apartments and three people are allowed to rent one-bedroom apartments.[14]  Defendants contend that, while Hunt was the manager at the Complex, at least one unit, Unit 456, had two children living in a two-bedroom unit.[15]  (Tenant File Review PgID 1342.)

Plaintiffs also argue that Hunt has attempted to enforce this policy.  Hunt sent at least one letter to a tenant on the basis of information indicating that the tenant's son was living with her.  (ECF No. 109-4 03/08 Letter PgID 1331.)  The son listed his home address as the tenant's address.  (*Id.*)  Hunt informed the tenant that if the son was staying with her full or part time, she would need to move to a two bedroom apartment "so we can have our residents in the 'appropriate' room size."  (*Id.*)

Defendants provide a different explanation for the letter.  Defendants explain that the son of the tenant was a 37 year old man who was required to register as a sex offender.  In a letter sent the day after the letter Plaintiffs' attach as their exhibit, Hunt explained to the tenant that her son was

---

[14]Defendants refer the Court to pages 15 and pages 34-35 of Hunt's deposition.  Hunt made no statements anywhere on pages 14-16 that could be reasonably construed as supporting the assertion made by Defendants in their brief.  On pages 34 and 35 of his deposition, Hunt discusses his understanding of "familial status law," and not the Tenant Section Criteria.  (Hunt Dep. 34-35 PgID 850.)  On pages 36, Hunt is asked "[w]hat is the total number of people who then could reside in a two-bedroom apartment at Clayborne Court Apartments based on your understanding of familial status law that you have described?"  (*Id.* 36 PgID 850.)  Hunt replies that he is "very happy with five people in a two bedroom.  I'm very happy with any number in a two bedroom."  (*Id.* 37 PgID 850.)  Later, Hunt answers the question by saying "I cannot accurately answer the two-bedroom familial status in Clayborne Court" because the situation has never presented itself.  (*Id.* 38 PgID 851.)

[15]The entry for "4561 2 bedroom" shows that a tenant named "Digby" rented the unit from June 2001 through April 2004 and had 2 children.

39

not on the lease and therefore cannot use her address as his address for the purpose of the Michigan Public Sex Offender Registry. (ECF No. 130-5 PgID 2551.)

Plaintiffs argue the two emails sent to prospective tenants (Factual Allegations in the Record ¶ 9) and the affidavit from Tammie Domaska (*Id.* ¶ 11) support their claim for familial status discrimination.

Plaintiffs are entitled to summary judgment on their FHA § 3604(c) and ELCRA § 37.2502(1)(f) claims that Defendants' Tenant Selection Criteria, under the ordinary reader standard, would discourage families from seeking to rent an apartment from Defendants. There is no genuine issue of material fact concerning the words in the Tenant Selection Criteria. The document states that the Complex may decline to rent an apartment when more than one person or couple will reside in a unit with only one bedroom. The emails confirm that Defendant makes prospective tenants aware of this policy. Defendants' argument, that they have only reserved the right to exclude, rather than explicitly declined to rent under such conditions, is no defense. The ordinary reader would interpret the words used as discouraging families from seeking to rent an apartment. Defendants' argument was functionally rejected in *Jancik*, where the advertisement indicated that a mature person was "preferred." Similar to the situation here, the word "preferred" would discourage renters who do not fall into the "preferred" category. Under the ordinary reader standard, the ad indicates, or suggests, that apartments will not be rented to families with children.

Plaintiffs, however, are not entitled to summary judgment on their § 3604(a) and § 37.2502(1)(a) and (b) claims that Defendants' Tenant Selection Criteria discriminates against families. Multiple federal courts have examined occupancy limits as potential violations § 3604(a) of the FHA. *See, e.g, United States v. Badgett*, 976 F.2d 1176, 1180 (8th Cir. 1992) (considering

a one person per bedroom policy); *Gashi v. Grubb & Ellis Prop. Mgt. Servs., Inc.*, 801 F. Supp. 2d 12, 16-19 (D. Conn. 2011) (considering disparate impact claim arising from a two people per bedroom policy); *Reeves v. Rose*, 108 F. Supp. 2d 720, 727-28 (E.D. Mich. 2000) (considering a disparate treatment claim arising from a policy of no more than three people for a two bedroom apartment); *United States v. Tropic Seas, Inc.*, 887 F. Supp. 1347, 1359-62 (D. Hi. 1995) (considering a policy limiting studio and one bedroom apartments to two persons and two-bedroom apartments to three people); *Fair Hous. Council of Orange Cnty., Inc. v. Ayres*, 855 F. Supp. 315, 317-319 (C.D. Cal. 1994) (considering a two person restriction on two-bedroom apartments). In each instance, the courts found that the plaintiffs were able to establish a prima facie case based on the policy restrictions. *Badgett*, 976 F.2d at 1180; *Gashi*, 801 F. Supp.2d at 17; *Reeves*, 108 F. Supp.2d at 728 (finding that there was a genuine issue of material fact as to the reasonableness of the occupancy policy and also whether the restriction was a pretext for discrimination); *Tropic Seas*, 887 F. Supp. at 1360; *Ayers*, 855 F. Supp. at 318.

The results in these cases differed, however, at the second and third stages of the burden-shifting analysis. In *Badgett*, the circuit court rejected the defendant's non-discriminatory explanation for the restriction, that there was limited parking. *Badgett*, 976 F.2d at 1180. The court concluded, as a matter of law, that no fact-finder could find the explanation was anything other than pretext because the plaintiff's five year old daughter did not affect available parking. *Id.* The court also pointed out that individuals may own more than one car, so the restriction did not address the concern. *Id.* In *Gashi*, the court also rejected the defendant's non-discriminatory justification. *Gashi*, 801 F. Supp. 2d at 18-19. The defendants pointed to the NFPA Life Safety Code, which was not binding on the complex, structural concerns for the building, and HUD guidelines. *Id.* The court

41

found problems with each explanation. *Id.* Finally, the court concluded that the defendant had not established that no less discriminatory alternative was available. *Id.* In *Tropic Seas*, the court rejected the defendant's non-discriminatory justification. *Tropic Seas*, 887 F. Supp. at 1361. The defendant relied on a local housing code. *Id.* The court concluded that the occupancy restriction was more restrictive than the local code and was also not based on square footage. *Id.* at 1362. In *Ayers*, the court rejected the defendant's non-discriminatory justification. *Ayers*, 855 F. Supp. at 319. The defendant justified the occupancy limits on the need to prevent damage and wear and tear on the domicile. *Id.* at 318-19. The court concluded the defendant had no authority to support that concern as a compelling necessity and failed to produce any evidence that the restriction achieved that goal. *Id.* at 319. In slight contrast to these opinions, in *Reeves*, the court concluded there was a genuine issue of material fact whether the proffered non-discriminatory justification was pretextual. *Reeves*, 108 F. Supp. 2d at 728. The defendant relied on the local building code, an expert report concluding that the restrictions were reasonable, and the fact that only one tester was informed of the restriction. *Reeves*, 108 F. Supp. 2d at 727-28.

Taking the facts in the record in the light most favorable to Defendants, Plaintiffs have established a prima facie case for familial status discrimination. This conclusion is consistent with *Williams v. American Homestead Mgt.*, No. 4:04-cv-56 (W.D. Mich. Mar. 3, 2005) (Quist, J.) (memorandum order), where this district has found that a policy of refusing to rent a one-bedroom apartment to a single-parent, single-child family violated the federal and state prohibition against family discrimination.[16] (ECF No. 111-2 PgID 1376-80). The Tenant Selection Criteria restricts

---

[16]Because the defendant did not file any response to the motion, the court did not evaluate whether the defendant offered a legitimate, non-discriminatory justification for the policy.

access by families to the apartments offered by Defendants.  From Hunt's testimony about his understanding of housing law, a reasonable fact-finder could infer that the Complex's occupancy restrictions are an attempt to comply with local housing codes.  (Factual Allegations in the Record ¶ 9.)  The local housing code, which Defendants discuss briefly in their response (Def. Resp. 20-21), is based on square footage.  Neither party has directed the Court's attention to any portion of the record where the square footage of the Defendants' studio, one-bedroom, and two-bedroom apartments is identified.  Furthermore, Hunt testified that the Complex will rent one-bedroom apartments to two people and two-bedroom apartments to three people.  Therefore, there remains a genuine issue of material fact whether this explanation is pretext.  Defendants have also provided a legitimate, nondiscriminatory justification for the letter sent to one tenant about her son.  The record does not indicate if Defendants learned about the specific details of the son before or after the first letter was sent.  Therefore, there remains a genuine issue of material fact whether that explanation is pretext for discrimination.

### F.  WAITING LIST

Plaintiffs argue the waiting list policy discriminates against families.  (Factual Allegations in the Record ¶ 10.)  Plaintiffs asserts that waiting list favors current tenants in studio and one-bedroom apartments.  Plaintiffs reason that because the Tenant Selection Criteria discriminates against renting studio and one-bedroom apartments to families, the waiting list must also discriminate against renting two-bedroom units to families.  Plaintiffs argue that, based on the Tenant File Review, two-bedroom apartments have become available thirteen times since January

2008 and not once was the apartment offered to a current tenant with children.[17]  Defendants counter that the discussion of the waiting list provides no evidence of discriminatory intent.  Defendants assert that Plaintiffs have mischaracterized Hunt's testimony by leaving out important details.  Finally, Defendants argue that Hunt moved at least one tenant from a one bedroom to a two bedroom when the tenant had a baby.[18]  (Hunt Dep. 188 PgID 888.)

Plaintiffs are not entitled to summary judgment on their § 3604(a) and § 37.2502(1)(a) and (b) claim that the waiting list discriminates against families.  Again, the facts must be taken in the light most favorable to Defendants.  Plaintiffs initial premise in their argument, that the waiting list favors current tenants in studio and one-bedroom apartments, has no support in the record.  In fact, when asked whether Clayborne Court has a policy "to favor an existing tenant who lives in a one-bedroom who then asks to move into a two bedroom," Hunt replied "There's no policy that favors.  We do like to go to the waiting list, yes."  (Hunt Dep. 189 PgID 888.)  The only copy of the waiting list in the record includes both current tenants and individuals who called to inquire about the availability of a two-bedroom apartment.  (ECF No. 110-2 PgID 1358.)  Because the waiting list includes people who are not current tenants, the initial premise in Plaintiffs' argument is a material question of fact.

---

[17]To be accurate, the Tenant File Review does not indicate to whom the apartments were offered.  The Tenant File Review indicates only who rents the apartment.

[18]At his deposition, Hunt explained that Amy Peters and George Lloyd rented two different one-bedroom apartments and, at some point, they got married and moved into a two-bedroom apartment.  (Hunt Dep. 188–89 PgID 888.)  The Tenant File Review indicates "Lloyd" moved into Unit 4649, a two-bedroom apartment, in October 2008.  (Tenant File Review 12 PgID 1345.)  The Tenant File Review shows "Lloyd" resided in that apartment at least through the time when the list was compiled.  (*Id.*)  The Tenant File Review does not show that "Lloyd" has any children living in the apartment.  (*Id.*)

## G.  MILLERS'S EVICTION NOTICE

Plaintiffs argue the letter evicting them contains a statement that is discriminatory.  (Factual Allegations in the Record ¶ 23.)  Plaintiffs point to the portion of the letter that indicates the Complex markets to an older clientele.  Defendants point to the portion of the letter that refers to a series of unfortunate events.  Defendants explain that the reason the Millers's lease was not renewed was because Ken Miller assaulted Hunt.

Plaintiffs are not entitled to summary judgment on their § 3604(c) and § 37.2502(f)(1) claim that the 08/08 letter is discriminatory.  Taking the facts in the light most favorable to Defendants, under the ordinary reader standard, the letter would not discourage younger people or families from seeking to rent an apartment from Defendants.  The ordinary reader could interpret the letter as directing the Millers to seek alternative housing on the basis of the series of "unfortunate instances." The Millers already had an apartment at Clayborne Court and had already had their lease renewed once.  The ordinary reader would not interpret the letter as now declining to renew the Millers's lease on the basis that the Complex was marketed to an older clientele.

## VII.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 114)

In this motion, Defendants seek summary judgment on the claims against them not addressed in their previous motion for summary judgment.

## A.  THE MILLERS

Defendants address the Millers's potential claim for race discrimination.  Defendants argue the Millers cannot establish a race discrimination claim against them because the Millers are not members of a protected class.  Defendants argue the Millers were never rejected for an apartment on the basis of race.  Defendants point out that the only race-related statement in the record occurred

in 2007. One of the Millers's daughters was dating an African-American man and Hunt allegedly

expressed is disapproval of the man's presence at the Complex. (Compl. ¶ 17.) Defendants point

out that the Miller's lease was renewed in 2008. (Factual Allegations in the Record ¶ 16.)

In their response, Plaintiffs do not address this portion of Defendants' motion. (ECF No. 123

Pl. Resp.)

Defendants are entitled to summary judgment on any race discrimination claims the Millers

might have under FHA § 3604(a), ELCRA § 37.2502(1)(a) and (b) and 42 U.S.C. § 1982.[19] Based

on the response, the Millers have waived this claim. In the event the Millers have not waived the

claim, and assuming the Millers have standing to bring this claim, the Millers have not established

that they were ever denied any apartment on the basis of race. The alleged comment about the

boyfriend occurred before the Miller's lease was renewed in 2008. Even if the Millers were able to

make a prima facie case for disparate treatment on the basis of race, Defendants have offered a

legitimate, nondiscriminatory justification for not renewing the lease. The Millers had caused

several disturbances at the complex and Ken Miller had a verbal and physical confrontation with

Hunt. There is no assertion and no evidence to support the conclusion that the Millers were denied

a two-bedroom apartment on the basis of race. In the complaint, the Millers do not allege any injury

on the basis of the lack of diversity in the tenants at the Complex.

## B. FAIR HOUSING CENTER

Defendants argue the record contains no evidence, with regard to any tester, that they refused

---

[19]In addition, there are no facts in the record to support a race discrimination claim by the Millers under FHA § 3604(c) and ELCRA § 37.2502(1)(f). The comment about the Millers's daughter's boyfriend was, at best, a stray remark not connected to the rental of a dwelling. *See Campbell*, 162 F. App'x at 467.

to rent, refused to negotiate for the rental of, or denied a dwelling as the result of any tester's age, race, or family status.  Defendants argue the reports filed by the testers contain no statements by Hunt or any other Defendant that would violate § 3604(c).  Defendants argue none of their advertising violates § 3604(c).  Finally, Defendants argue, assuming a disparate impact claim has been made, that Plaintiffs cannot identify any policy that has caused a disparate impact on any protected group. Defendants argue their expert report shows that the tenant population at Clayborne Court is consistent with the local community.  In their brief in support of this motion, Defendants summarize the demographic characteristics for the tenant population as of August 31, 2008, citing the report of their expert.  (Amended Filas Report 5-6 PgID 2987-88.)  Filas concludes her report by opining  that the demographic characteristics of the tenant population at Clayborne Court is generally "consistent with the overall demographic data."  (*Id* 8 PgID 2990.)

Plaintiffs respond to Defendants' motion with somewhat more specificity as to each claim. (ECF No. 123 "Pl. Resp.")  Plaintiffs insist that Defendants' ads promoting the Complex as "senior housing" indicate a preference for seniors.  Plaintiffs point to the ads in the Kalamazoo Gazette and the Senior Services publication.  Plaintiffs identify additional places where Clayborne Court has been advertised on the internet as "senior housing," such as through Rentlinx (ECF No. 123-3 PgID 2115), the Michigan State Housing Development Authority (ECF No. 123-3 PgID 2117), and Show Me the Rent (ECF No. 123-3 PgID 2122).  Plaintiffs also argue that Defendants advertise in other publications targeting seniors, such as "Senior Times" (ECF No. 124-3 PgID 2168-75) and the "Generations" insert in the Kalamazoo Gazette (ECF No. 124-5 PgID 2186-97).  Plaintiffs argue that Defendants' ads promoting the Complex as "Senior Friendly" indicates a preference for seniors. Plaintiffs argue that Defendants' "Designed Just for You" ads and flyer indicate a preference for

47

seniors.

Plaintiffs argue Defendants use of models in their ads indicates preferences for seniors. Plaintiffs argue that of the pages of ads produced by Defendants in discovery, 28 pages, or 85% of the ads, use Caucasian models who appear to be at least 55 years old.  (ECF Nos. 125-1, 125-2, and 125-3.)

Plaintiffs argue Defendants' advertising budget reinforces the conclusion that Defendants prefer to rent apartments to seniors.  In 2007, Clayborne Courts spent approximately $7,137.69 on advertising.  (Def. Br. 5 PgID 1431; ECF No. 126-1 Huff Affidavit ¶ 10 PgID 2233.)  Reviewing the ads purchased by Clayborne Courts in 2007, Plaintiffs argue approximately 72% of the budget was spent on ads targeting seniors.  (Huff Affidavit ¶ 10.)

Plaintiffs argue Hunt told some of the testers that the Complex was marketed to those 55 and older.  Plaintiffs point out that Hunt told Maye the Complex was marketed to 55 and older, but that he could not legally say that the Complex was a senior place.

Plaintiffs argue the Tenant Selection Criteria and the waiting list policies both discriminate against families.

Plaintiffs argue that the demographic characteristics of the tenants at Clayborne Courts are sufficient to raise a genuine issue of material fact.  Plaintiffs argue the Tenant File Review establishes the increase in those over 55 living in the Complex since 2004.  Plaintiffs argue Filas's report shows that only 7% of the renters at the Complex are African-Americans, whereas 16% of renters in Kalamazoo are African-American.

### 1. Familial Status

Defendants are not entitled to summary judgment on Plaintiffs' claims for familial status

discrimination under FHA § 3604(c) and ELCRA § 37.2502(1)(f) arising from the ads and statements made by Hunt.  As discussed under the section of this opinion addressing Plaintiffs' motion, there remain questions of material fact whether any of the ads or statements express a preference for seniors, and thus a preference not to rent to families.

The Court has already concluded that Plaintiffs are entitled to summary judgment on Plaintiffs' FHA § 3604(c) and ELCRA § 37.2502(1)(f) claim for familial status discrimination based on the Tenant Selection Criteria.

With regard to familial status claims by the FHC brought under FHA § 3604(a) and ELCRA § 37.2502(1)(a) and (b), Plaintiffs have acknowledged that the FHC is not asserting a disparate impact claim here.  (ECF No. 205 Hrg. Trans. PgID 3460.)  On the assumption that Plaintiffs are asserting a disparate treatment claim, Defendants are not entitled to summary judgment on Plaintiffs' claims for familial status discrimination under FHA § 3604(a) and ELCRA § 37.2502(1)(a) and (b) arising from the Tenant Selection Criteria.  Taking the facts in the record in the light most favorable to Plaintiffs, there remain genuine issues of material fact whether the Tenant Selection Criteria operates to discriminate against families.  The FHC has standing to raise the claim even if no tester was ever denied an apartment.  The Tenant Selection Criteria, on its face, operates to deny apartments to families.  As explained previously, there are genuine issues of material fact concerning the second and third phases of the burden-shifting analysis.

Defendants, however, are entitled to summary judgment on a disparate treatment claim arising from the waiting list.  Nothing in the waiting list treats people differently on account of their family status.  Plaintiffs have waived any disparate impact familial status claim.

**2.  Age**

49

Defendants are not entitled to summary judgment on the basis of any age discrimination claims raised by FHC.  The age claims are related to FHC's familial status discrimination claims.  For the same reasons Defendants are not entitled to summary judgment for FHC's familial status discrimination claims under FHA § 3604(c) and ELCRA § 37.2502(1)(F), Defendants are not entitled to summary judgment on the age discrimination claims brought under the ELCRA § 37.2502(1)(f).

### 3.  Race

As noted above, FHC is only advancing a race discrimination claim under a discriminatory impact theory.  Recall, Plaintiffs' race discrimination claim arises, at least in part, from Plaintiffs' assertion that minorities are uniquely affected by discriminatory policies against families.  Defendants' evidence on this point comes from the statistics about the demographics at the Complex as of August 31, 2008 in Filas's report.  (Amended Filas Report 5-6 PgID 2987-88.)  Defendants argue Filas opines reasons why families would prefer not to rent an apartment at the Complex.  (Filas Report 6-7 PgID 2988-89.)  Those particular opinions, however, were deemed inadmissible by the magistrate judge.  (ECF No. 157 Memorandum Opinion 7-10 PgID 3026-29.)  Plaintiffs counter that, according to Filas's report, 16% of the individuals renting an apartment in Kalamazoo in 2008 were African-American, while only 7% of the individuals renting an apartment at the Complex were African-American.  (Amended Filas Report 7 PgID 2989.)

Defendants are not entitled to summary judgment on the basis of any race discrimination claims raised by FHC.  Plaintiffs have established a prima facie case for disparate impact discrimination based on race.  This burden in minimal.  Plaintiffs have identified a housing policy that allegedly discriminates against families and Plaintiffs have alleged that minority families are

adversely affected by familial status discrimination.  Finally, Plaintiffs have pointed out that there exists a statistical disparity between the minority rental population in Kalamazoo and the minority rental population at the Complex.  As explained by Magistrate Judge Scoville, the data compiled and presented in Filas's report is admissible.  (Memorandum Opinion 6 PgID 3025.)  However, Filas has no experience or education in the area of housing or housing discrimination.  (*Id.* 8 PgID 3027.)  To the extent that Filas opines that the rental practices at Clayborne Court have not resulted in discrimination, those opinions are not admissible.  For the purpose of this motion, the evidence must be viewed in the light most favorable to Plaintiffs.  As reasonable people could disagree about the significance of the statistics, there remain genuine issues of material fact on Plaintiffs' disparate impact race discrimination claim.

### C.  DOOGE

Defendants argue that the record contains no evidence that Dooge engaged in any discriminatory behavior.  Defendants ask the Court to dismiss the individual claims against Hunt and Dooge.

Plaintiffs disagree.  Plaintiffs argue Hunt ran the day-to-day operations of the Complex.  (Hunt Dep. 145 PgID 877.)  Hunt creates the advertisements and flyers for Clayborne Court, with assistance from some of the places where Clayborne Court advertises.  (*Id.* 108-09 PgID 868.)  Hunt maintained the waiting list and made the decisions about offering two bedroom apartments.  (*Id.* 189-91 PgID 888-89.)  Plaintiffs argue Dooge is aware of how Hunt manages Clayborne Court.  Hunt corresponds, typically by email and telephone, with Dooge about Clayborne Court between three and six times each week.  (ECF No. 114-1 "Dooge Dep." 61-62 PgID 1470-71.)  Dooge reviews any copies of advertisements sent to him by Hunt.  (*Id.* 60 PgID 1470.)  Plaintiffs argue Dooge may be

held liable for his own conduct.

Under the FHA, a defendant may be held vicariously liable for the discriminatory actions of an agent. *Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("Nonetheless, it is well established that the [Fair Housing] Act provides for vicarious liability."); *see Reeves*, 108 F. Supp. 2d at 727 (citing *Green v. Century 21*, 740 F.2d 460, 465 (6th Cir. 1984)). Under the traditional rules of vicarious liability, principals and employers may be held vicariously liable for acts of their agents or employees within the scope of their authority or employment. *Meyer*, 537 U.S. at 285.

Defendants are not entitled to summary judgment on the claims against Hunt and Dooge personally. Taking the facts in the light most favorable to Plaintiffs, Hunt made the day-to-day decisions about the management and operation of Clayborne Court. As an employee of Clayborne Court, Clayborne Court can been held liable for Hunt's actions. Dooge was at least aware of some of the advertisements used by Clayborne Court. Because of the weekly correspondence between Dooge and Hunt, there exists a question of material fact whether Dooge was aware of any of the other statements on which Plaintiff's base their claims.

## CONCLUSION

For the reasons outlined above, the motions are GRANTED IN PART and DENIED IN PART. Specifically, Defendants' motion for partial summary judgment (ECF No. 86) is GRANTED only on the Millers's familial status discrimination claims under FHA § 3604(a) and ECLRA § 37.2502(1)(a) and (b). Those claims are DISMISSED WITH PREJUDICE. Plaintiffs' motion for summary judgment (ECF No. 105) is GRANTED only on their claims for familial status discrimination under FHA § 3604(c) and ELCRA § 37.2502(1)(f) based on the Tenant Selection Criteria and prospective client emails. Finally, Defendants' motion for summary judgment (ECF No.

114) is GRANTED only on the Millers's race discrimination claims.

## **ORDER**

Consistent with the accompanying opinion, **IT IS HEREBY ORDERED** that

1.  Defendants' motion for partial summary judgment (ECF No. 86) is **GRANTED IN PART and DENIED IN PART;**

2.  Plaintiffs' motion for partial summary judgment (ECF No. 105) is **GRANTED IN PART and DENIED IN PART;** and

3.  Defendants' motion for partial summary judgment (ECF No. 114) is **GRANTED IN PART and DENIED IN PART.**

Date:__March 29, 2012__                                  ___/s/ Paul L. Maloney____
                                                         Paul L. Maloney
                                                         Chief, United States District Judge