UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| FAIR HOUSING CENTER OF SOUTHWEST MICHIGAN, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:09-cv-593 |
| v. | ) ) | Honorable Paul L. Maloney |
| JOSEPH M. HUNT, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>OPINION ON MOTION FOR AWARD OF COSTS AND ATTORNEY'S FEES</u>

This was a civil rights action alleging housing discrimination in violation of the Fair

Housing Act (FHA), 42 U.S.C. §§ 3601-3619, the Civil Rights Act, 42 U.S.C. §§ 1982-1996b, and

the Elliott-Larsen Civil Rights Act, MICH. COMP. LAWS §§ 37.2501-.2507.  After over three years

of litigation, the parties entered into a court-approved Settlement Agreement (docket # 247) under

which defendants paid plaintiffs $47,500.00 in satisfaction of all claims for damages and agreed to

a number of remedial measures, including a three-year period of monitoring by plaintiff Fair Housing

Center.  The Settlement Agreement (¶ V) reserved the question of taxation of attorney's fees and

costs for resolution by the court.  The parties thereafter submitted to the court a stipulation to dismiss

the case with prejudice, subject to the court's retention of jurisdiction to enforce the Settlement

Agreement.  The stipulated judgment further provided that the question of attorney's fees and costs

would be referred to a magistrate judge for final determination pursuant to 28 U.S.C. § 636(c).  Chief Judge Paul Maloney entered the stipulated judgment on August 15, 2012.  (docket # 249).

Thereafter, plaintiffs filed a motion for the taxation of attorney's fees and costs, seeking $605,507.92, consisting of $587,905.00 in attorney's fees and $17,602.92 in taxable costs. Defendants oppose the motion on every possible ground, contending that plaintiffs do not enjoy "prevailing party" status entitling them to an award of attorney's fees and, if they are entitled to fees, that the amount sought is grossly excessive.  After both parties had extensively briefed the issues, I conducted oral argument on October 22, 2012.  For the reasons set forth below, I conclude that (1) plaintiffs are entitled to recover their taxable costs in the amount requested; (2) plaintiffs are prevailing parties within the meaning of 42 U.S.C. § 3613(c)(2), but not for purposes of 42 U.S.C. § 1988; and (3) although plaintiffs' counsel is entitled to an award of fees, the fee request is unreasonable, both because the hours devoted to this case were excessive and because the fee request makes no effort to account for the limited success that plaintiffs achieved in this case.

**Findings of Fact**[1]

Defendants own or operate a 140-unit apartment complex located in Kalamazoo, Michigan, called "Clayborne Court."  The apartment complex includes 96 one-bedroom apartments, 10 two-bedroom apartments, and 34 studio apartments.  The controversy that blossomed into a lawsuit began when plaintiffs Kenneth and Teresa Miller complained to plaintiff Fair Housing Center of Southwest Michigan about their treatment as tenants in this complex.  They first rented

---

[1] In identifying the legal claims and factual contentions of the parties, this opinion relies heavily on Chief Judge Maloney's comprehensive opinion of March 29, 2012 (docket # 209), in which he adjudicated motions for summary judgment by both plaintiffs and defendants.

a one-bedroom apartment in the complex in 2004. Several months into their lease, they moved into a two-bedroom unit. They stayed at Clayborne Court for about one year and then left. The Millers returned to Clayborne Court in 2006 and asked for a two-bedroom apartment. Defendant Joseph Hunt, the complex manager, told the Millers that he had only one-bedroom apartments available. They accepted a one-bedroom apartment, but asked to be put on the waiting list. They signed a lease that began on September 1, 2006, and ended August 31, 2007. They thereafter extended the lease through August 31, 2008. They never received assignment to a two-bedroom apartment.

The Millers were involved in more than one incident in which police were called to the complex to respond to claims of domestic violence. On August 6, 2008, Hunt called the police to report that he had been assaulted by plaintiff Kenneth Miller.

At some point during the Millers' second stay at Clayborne Court, Teresa Miller approached the Fair Housing Center to complain about Joseph Hunt. She first reported that Hunt was discriminating against families with children, in favor of an older clientele. Ms. Miller's second complaint to the Fair Housing Center, however, followed her receipt of a Notice to Quit Tenancy on August 9, 2008, accompanied by a letter in which Hunt suggested that it would be in everyone's best interest that the Millers move out of the apartment complex, both because of "unfortunate occurrences" and because the complex marketed "only to an older clientele." Teresa Miller complained to the Fair Housing Center that Hunt was discriminating against her and her family. She told them that Hunt stated he would never rent a two-bedroom apartment to her because her grandchildren (for whom she did not have legal custody) would then move in with her. She also asserted that Hunt did not approve of her daughter's boyfriend, who was African-American.

In response to the Millers' complaints, the Fair Housing Center sent in testers to Clayborne Court. Each of the testers spoke to defendant Hunt and pretended to be interested in renting an apartment. During these discussions, Hunt made statements such as the complex was marketed "to an older crowd" or that he liked to rent to people who are over 55 years old because they are quiet. Plaintiffs do not allege, however, that Hunt refused to rent to any of the testers. After sending in testers in August and September of 2008 and February and May of 2009, the Fair Housing Center, joined by the Millers, initiated this civil action.

Plaintiffs' complaint contains three counts: violation of the Fair Housing Act arising from "race and familial status discrimination" (Compl. ¶ 31); a claim for violation of 42 U.S.C. § 1982 for "unlawful acts of discrimination based on race or color against the plaintiffs" (Compl. ¶ 34); and violation of the Elliott-Larsen Civil Rights Act arising from unlawful discrimination and unfair housing practices (Compl. ¶ 36). As Judge Maloney has previously remarked, the complaint is pleaded in the most generic terms possible and makes no effort to differentiate between the claims of the Millers and the claims of the Fair Housing Center. (Op. at 24, ID# 3535, docket # 209).

The case was aggressively litigated by plaintiffs' attorneys, one of whom has an ongoing relationship with the Fair Housing Center. The docket sheet shows more than the usual amount of motion practice, especially motions addressed to discovery disputes. Seven members of the Miller Canfield firm (three partners, two associates, and two paralegals) expended over 2,600 hours in litigating the case.

By the time dispositive motions were filed, the substantive claims in the case had significantly proliferated and extended well beyond the claims pleaded in the complaint. Chief Judge Maloney synthesized plaintiffs' claims as follows:

-4-

The Millers and FHC thus assert claims for age, race, and familial status housing discrimination that require analysis under the burden-shifting scheme. The Millers's and FHC's familial status discrimination claims, that require analysis under the burden-shifting scheme, arise under the FHA § 3604(a) and the ELCRA § 37.2502(1)(a) and (b). Here, Plaintiffs reason that when Defendants favor renting to seniors, they necessarily discriminate against families. The Millers's and FHC's race discrimination claims, that require analysis under the burden-shifting scheme, arise under the FHA § 3604(a), the ELCRA § 37.2502(1)(a) and (b), and 42 U.S.C. § 1982. Here, Plaintiffs reason that discrimination against families has a bigger effect on racial minorities than on Caucasian renters. (ECF No. 123 Pl. Resp. to Def. Sec. Mot. 2.) The Millers's and FHC's age discrimination claims, that require analysis under the burden-shifting scheme, arise under the ELCRA § 37.2502(a)(1) and (b). Plaintiffs argue Defendants discriminate by favoring seniors.

The Millers and FHC also assert claims for age, race, and familial status housing discrimination that requires analysis under the ordinary reader standard. The Millers's and FHC's familial status discrimination claims, that require analysis under the ordinary reader standard, arise under the FHA § 3604(c) and the ELCRA § 37.2502(1)(f). Here, Plaintiffs reason that when Defendants indicate a preference for seniors, they discriminate against families. The Millers's and FHC's race discrimination claims, that require analysis under the ordinary reader standard, arise under the FHA § 3604(c) and the ELCRA § 37.2502(1)(f). The Millers's and FHC's age discrimination claims, that require analysis under the ordinary reader standard, arise under the ELCRA § 37.2502(1)(f). Plaintiffs argue Defendants have indicated a preference for seniors.

(Op. & Order at 24-25, docket # 209).

After the close of discovery, both parties moved for summary judgment. Plaintiffs' motion sought a judgment finding defendants liable as a matter of law on nine alleged statutory violations. Defendants sought dismissal under Rule 12(b)(6) or summary judgment under Rule 56 as to all claims. On March 29, 2012, Chief Judge Maloney issued a comprehensive opinion addressing the parties' dispositive motions. In summary, the court held as follows:

- The Millers had pleaded and factually supported a claim for familial status discrimination for Hunt's failure to offer them available two-bedroom apartments, sufficient to withstand summary judgment. FHA § 3604(a). (Op. 28-29).

•   Defendants were entitled to summary judgment on the Millers' claim for familial status discrimination under FHA § 3604(a) arising from the termination of their tenancy,[2] because defendants had a legitimate, nondiscriminatory reason for evicting them -- the Millers' disruptive and assaultive behavior.  (Op. 29).  Similarly, defendants were entitled to summary judgment on the Millers' claim for race discrimination under FHA § 3604(a) and 42 U.S.C. § 1982, arising from the termination of their tenancy, for lack of proof.  (Op. 45-46).

•   The Millers had stated a triable claim for familial status discrimination under FHA § 3604(c), arising from Hunt's August 2008 letter, which could be deemed a statement of a preference against renting to families.  (Op. 30).

•   The Fair Housing Center had pled and supported viable claims for familial status discrimination under FHA § 3604(a) and (c) arising from defendants' advertisements, Hunt's statements to testers, and a document called "Tenant Selection Criteria," all of which suggested a preference for seniors.  (Op. 31-32).

•   Plaintiffs were not entitled to summary judgment on their claims under FHA § 3604(c) arising from defendants' use of the term "Senior Friendly" (Op. 33-34), their use of the phrase "Designed Just for You" (Op. 34-35), their running of ads in the "Senior Part" section of the newspaper (Op. 35-37), or Hunt's statements to testers that the apartments are "marketed to 55 and older" (Op. 37-38).  Plaintiffs had not established beyond genuine issue that these advertisements expressed a preference against any protected class.

---

[2] Chief Judge Maloney's rulings on the state-law claims were consistent with his decisions on the federal claims under the FHA and Civil Rights Act.

• Plaintiffs were entitled to summary judgment on their claim that defendants' "Tenant Selection Criteria" discriminates against families. The court found a violation of FHA § 3604(c), in that families would be discouraged from applying under the ordinary reader standard. (Op. 37-40). Plaintiffs, however, were not entitled to judgment on their familial discrimination claim under FHA § 3604(a) based on the same document, because defendants had raised a legitimate, non-discriminatory reason for their actions.

• Plaintiffs were not entitled to summary judgment on their claim under FHA § 3604(a) that defendants' use of a waiting list discriminates against families. (Op. 43-44).

• The Millers were not entitled to summary judgment on their claim under FHA § 3604(c) based on statements made by Hunt in the cover letter to the eviction notice. (Op. 45).

• Defendants were not entitled to summary judgment on plaintiff's claim for familial status discrimination under FHA § 3604(a) arising from advertisements and statements by Hunt. (Op. 48-49).

• The Fair Housing Center withdrew any familial status claim under FHA § 3604(a) based on a disparate impact theory. (Op. 49). With regard to the Center's disparate treatment claim, the court found a triable issue on the question whether use of the Tenant Selection Criteria operates to discriminate against families under the burden-shifting analysis applicable to claims under section 3604(a). (Op. 49).

• Defendants were entitled to summary judgment on the claim under FHA § 3604(a) based on the waiting list, on either a disparate treatment or disparate impact theory. (Op. 49).

• Defendants were not entitled to summary judgment on the Fair Housing Center's age discrimination claims under FHA § 3406(c). (Op. 50).

• The Fair Housing Center's claim under FHA § 3406(a) for race discrimination, based on a disparate impact theory that minorities were uniquely affected by defendants' alleged discrimination against families, was sufficient to survive summary judgment. (Op. 50-51).

• The individual defendants were not entitled to summary judgment on the claims against them. (Op. 51-52).

After Judge Maloney's ruling on dispositive motions, the parties participated in a 3½-hour settlement conference on May 17, 2012. The parties were able to resolve all substantive issues in principle, except for the amount in attorney's fees claimed by plaintiffs' counsel. No settlement was reached, and the case proceeded towards trial. Plaintiffs filed a flurry of pretrial motions, including several motions in limine and a motion for sanctions arising from alleged spoliation of electronically stored information, arising from Mr. Hunt's failure to preserve some of his e-mail responses to prospective tenants.

The parties appeared before Chief Judge Maloney for a final pretrial conference on July 16, 2012. Shortly thereafter, however, the parties informed Judge Maloney's office that the matter had been settled. (*See* Order, docket # 245).

The terms of the settlement are set forth in a Settlement Agreement dated July 30, 2012. (docket # 247-1). After lengthy recitation of the contentions of the parties, the Settlement Agreement set forth the following substantive terms of settlement:

-8-

- Defendants agreed to modify their current non-discrimination policy contained in rental applications and to provide a copy of the policy and a HUD booklet to each new tenant at the time the lease is signed. Copies must also be readily available in the manager's office for prospective tenants. (¶ II.A.).

- Defendants agreed that certain employees would undergo training at the Fair Housing Center. (¶ II.B.).

- Defendants agreed to post an Equal Opportunity Housing sign in any rental office. (¶ II.C.).

- Defendants agreed that their advertising would contain a stipulated legend concerning equal opportunity housing. They also agreed to refrain from using the terms "senior adult community" or "mature community" in any of their advertising and that at least twenty-five percent of their ads using human models would include children and twenty percent would include African-Americans. (¶ II.D.).

- Defendants agreed to include an Equal Opportunity Housing statement in all communications with prospective tenants. (¶ II.E.).

- Defendants agreed to refrain from using the phrase "one person or couple per bedroom" in their tenant selection criteria or in any other communication with prospective tenants. (¶ II.F.).

- Defendants agreed to provide a right of first refusal to prospective tenants with children on the waiting list for two-bedroom apartments. (¶ II.G.).

- Defendants agreed to include certain language in their rental applications. (¶ II.H.).

- Defendants agreed to maintain certain records and to allow the Fair Housing Center to review those records. (¶ II.I.).

- The parties agreed to a three-year period of monitoring by the Fair Housing Center and to a protocol to resolve alleged violations. (¶ III).

- Defendants agreed to pay $47,500.00 to plaintiffs in full satisfaction of all claims, the check to be payable to the Fair Housing Center. (¶ IV).

- The parties agreed to submit the question of attorney's fees and costs to the court for resolution. (¶ V).

- The terms of the Settlement Agreement were "incorporated into the Final Order of the Court dismissing with prejudice all Plaintiffs' claims." The parties agreed that the court would retain jurisdiction to enforce the settlement terms. (¶ VI).

On August 15, 2012, Chief Judge Maloney entered a stipulated final order, which recited that the court had reviewed the Settlement Agreement and found it to be in accordance with law and "fundamentally fair." The final order incorporated the Settlement Agreement by reference and directed that the parties comply with it. The final order also provided for retention of jurisdiction to enforce the Settlement Agreement for a three-year period. (Order, docket # 249).

After entry of the stipulated judgment, plaintiffs moved for taxation of $17,602.92 in costs and $587,905.00 in attorney's fees.

<u>Discussion</u>

I.    **Prevailing Party Status**

Plaintiffs seek an award of attorney's fees under the civil enforcement provisions of the Fair Housing Act, which grants the court discretion to allow the "prevailing party" a reasonable attorney's fee and costs.  42 U.S.C. § 3613(c)(2); *see Miami Valley Fair Hous. Ctr., Inc. v. Connor Group*, 725 F.3d 571, 581 (6th Cir. 2013) ("We review a district court decision on a motion for attorney's fees under an abuse-of-discretion standard.").  An award of taxable costs is sought under Rule 54(d)(1), which provides that costs should be allowed to the "prevailing party" in most circumstances.  FED. R. CIV. P. 54(d)(1).  Defendants object to the taxation of any fees or costs on the ground that plaintiffs are not prevailing parties.  Defendants' objection is not meritorious.

A prevailing party is one who achieves "a material alteration of the legal relationship of the parties." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Servs.*, 532 U.S. 598, 604 (2001).  The Supreme Court has held that a plaintiff is eligible for a fee award if the plaintiff has prevailed on "any significant claim affording some of the relief sought." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791 (1989).  It is not necessary that plaintiff prevail on the "central issue" or achieve the "primary relief sought." *Id.* at 791.  The relief cannot be merely declaratory or procedural; it must reach the underlying merits of the claim and affect "the behavior of the defendant towards the plaintiff." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987).

It is clear that the amount of a monetary award is not material to a plaintiff's status as prevailing party.  The controlling authority is *Farrar v. Hobby*, 506 U.S. 103 (1992).  In *Farrar*, a civil rights plaintiff received a nominal damage award of $1.00.  On this basis, the Fifth Circuit

-11-

held that plaintiff did not enjoy prevailing party status.  The Supreme Court held that "the prevailing party inquiry does not turn on the magnitude of the relief obtained."  506 U.S. at 114.  On this basis, the Court determined that plaintiff's recovery of even nominal damages entitles him to be treated as a prevailing party.[3]

With regard to settlements involving non-monetary relief, the Supreme Court has held that favorable settlements enforced through court-ordered consent decrees qualify plaintiffs for fee awards.  *See Maher v. Gagne*, 448 U.S. 122 (1980).  In *Buckhannon Board and Care Home*, a case decided under the Fair Housing Act, the Court differentiated between court-sanctioned consent decrees and voluntary changes in a defendant's conduct.  The Court held that the term "prevailing party," which is a legal term of art, does not include a party that has failed to secure a judgment on the merits "or a court-ordered consent decree."  532 U.S. at 600.  The Court stated that a defendant's voluntary change in conduct "lacks the necessary judicial *imprimatur* on the change."  *Id.* at 605.

Application of these authorities to the present case leads inexorably to the conclusion that plaintiffs are prevailing parties.  The court-approved Settlement Agreement awarded plaintiffs a monetary award in the amount of $47,500.00.  Under *Farrarr*, even a nominal damage award qualifies a plaintiff for prevailing party status.  *A fortiori*, an award approaching $50,000.00 has the same effect.  With regard to non-monetary relief, the court granted plaintiffs a summary judgment finding defendants liable for violation of FHA § 3406(c) arising from this use of the Tenant Selection Criteria.  In addition, the court-approved Settlement Agreement obliges defendants to take a number of remedial or prophylactic steps designed to prevent possible violations of the Fair

---

[3] The Court went on to hold that a plaintiff's prevailing party status does not necessarily mean that plaintiff should be awarded attorney's fees.  506 U.S. at 115.  This part of the Court's holding in *Farrarr* will become important in section III of this opinion.

Housing Act.[4] "Even a private settlement agreement over which a district court retains enforcement jurisdiction 'entails a level of judicial sanction sufficient to support an award of attorney's fees.'" *Grievson v. Rochester Psych. Center*, 746 F. Supp. 2d 454, 460 (W.D.N.Y. 2010) (quoting *Roberson v. Giuliani*, 346 F.3d 75, 82 (2d Cir. 2003)).

In arguing for a contrary result, defendants ignore the monetary recovery of $47,500.00, which in and of itself is sufficient to confer prevailing party status under the *Farrarr* decision. They also attempt to minimize the non-monetary relief in the Settlement Agreement, arguing that they would have been willing to agree to this sort of relief even in the absence of a lawsuit. The problem with defendants' afterthought argument is that there is no evidence to support it. Defendants criticize plaintiffs for not attempting a voluntary resolution before filing suit. Although plaintiffs can certainly be faulted for rushing to the courthouse, similar criticism can be lodged against defendants: they vigorously defended the case and, as far as the record is concerned, made no early overturns towards settlement. It is simple for a defendant to claim, after years of litigation, that a plaintiff should have taken a more irenic approach and that defendant would have been responsive to constructive suggestions to change its policies and practices, without the necessity of litigation. Such an argument is both untimely and unprovable after the entry of a judgment. *See Wells v. Corporate Account Receivable*, 683 F. Supp. 2d 600, 602 (W.D. Mich. 2010).

Defendants also seek refuge in cases involving a voluntary cessation of a defendant's conduct before litigation terminates. *See, e.g., Toms v. Taft*, 338 F.3d 519, 526 (6th Cir. 2003).

---

[4] By contrast, plaintiffs did not prevail on their claim under 42 U.S.C. § 1982, which was based on alleged race discrimination. Judge Maloney entered a summary judgment on this claim in favor of defendants, as there was no proof to support the claim.

Under *Buckhannon*, such voluntary accommodations are clearly not sufficient to confer prevailing party status on a plaintiff. Just as clearly, *Buckhannon* holds that a plaintiff who gains relief through a settlement agreement that is approved by the court and over which the court has continuing jurisdiction does qualify as a prevailing party. *See Toms*, 338 F.3d at 528-29.

In this case, plaintiffs were awarded $47,500.00 and effected a change in defendants' conduct through a summary judgment on one issue and through a settlement agreement, over which the court retained jurisdiction "for the purpose of hearing and determining any dispute regarding compliance." (Stipulation and Order of Dismissal at 1, docket # 249, ID# 3827). There is no cogent argument that this level of success was so minimal as to deprive plaintiffs of prevailing party status under the Supreme Court cases cited above.

## II.     Taxation of Costs

Plaintiffs seek an award of $17,602.92 in taxable costs. The majority of these costs consist of transcript fees for depositions and court hearings. Defendants object to the award of any costs, on the ground that plaintiffs are not prevailing parties. Beyond that, defendants do not lodge any specific objection to the items of costs sought in the bill of costs (docket # 253-2, ID#s 4289-91).

Rule 54(d)(1) of the Federal Rules of Civil Procedure provides that costs "should be allowed to the prevailing party," unless a statute, rule or court order otherwise directs. *See Marx v. General Revenue Corp.*, 133 S. Ct. 1166, 1172 (2013). The language of Rule 54(d)(1) "creates a presumption in favor of awarding costs, but allows denial of costs at the discretion of the trial court." *White & White, Inc. v. American Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir. 1986); *accord Marx*, 133 S. Ct. at 1172-73. Because the rule prescribes a course of action as the norm but allows

-14-

the district court to deviate from it, the court's discretion is more limited than it would be if the rule were nondirective. *Goosetree v. Tennessee*, 96 F.2d 854, 863 (6th Cir. 1986). It is therefore incumbent upon the unsuccessful party to show circumstances sufficient to overcome the presumption favoring an award of costs to the prevailing party. *White & White, Inc.*, 786 F.2d at 732.

Taxable costs are governed by chapter 123 of the Federal Judicial Code, 28 U.S.C. §§ 1911-1929. Items of taxable costs are enumerated in 28 U.S.C. § 1920. *See Taniguchi v. Kan Pacific Sipan, Ltd.*, 132 S. Ct. 1997, 1999-2000 (2012). The court is limited to taxing costs that fall within those enumerated in § 1920, and has no discretion to exceed the four corners of the statute. *See Taniguchi*, 132 S. Ct. at 2001, 2006; *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987). With regard to allowing or disallowing any particular cost item listed in section 1920, the court has broad discretion. *See Taniguchi*, 132 S. Ct. at 2001; *see also Little Rock Cardiology Clinic v. Baptist Health*, 591 F.3d 591, 602 (8th Cir. 2009). The principal issues are whether the claimed items are allowable by law and whether they were necessarily incurred and reasonable in amount. Although Rule 54(d)(1) contemplates that the Clerk will first tax costs, subject to review of objections by the court, this language is permissive. A district court therefore has discretion to take up the issue of costs itself in the first instance. *See BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 405 F.3d 415, 417-19 (6th Cir. 2005) *overruled on other grounds by Taniguchi*, 132 S. Ct. at 2000 (holding that the cost of document translation could not be taxed as a cost under § 1920).

Defendants do not object to any particular item of costs. Defendants merely argue, in less than a paragraph, that the $47,500.00 cash settlement contained in the Settlement Agreement was designed to cover the Fair Housing Center's out-of-pocket costs for the litigation. (Def. Brief

at 17, docket # 256).  This assertion, however, is not supported by the Settlement Agreement or any

other facts.  The Settlement Agreement, in paragraph IV, provides that defendants will pay the

amount of $47,500.00 in release of "all past and present claims, demands or expenses available

under any common law or federal statute which the Plaintiffs claim to have arising out of the

allegations set forth in their Complaint, including any and all known or unknown damages." (¶ IV,

docket # 247-1).  This language hardly supports a conclusion that the $47,500.00 settlement covered

plaintiffs' taxable costs.  To the contrary, the Settlement Agreement clearly states that the settlement

is paid in release of all claims for damages[5] (*id.*) and it contains a separate provision in paragraph

V(B) regarding taxed costs, leaving no doubt that costs under 28 U.S.C. § 1920 were not covered

by the cash settlement.

Once a prevailing party has submitted a bill of costs falling within the taxable cost

items enumerated in 28 U.S.C. § 1920, the burden is on the objecting party to articulate specific

objections to the reasonableness or necessity of the costs sought.  *BDT Prods.*, 405 F.3d at 419-20.

Defendants have not asserted that any item of claimed costs falls outside the scope of section 1920,

nor have they challenged the necessity or reasonableness of the costs sought.  This court therefore

finds that plaintiffs are entitled to recover costs in the amount claimed in their bill of costs.

---

[5] As Judge Maloney has previously observed in this case, the Fair Housing Center has
standing to seek damages on its own behalf.  (Op. at 30-31, docket # 209).  Thus, both the Center
and the individual plaintiffs had damage claims that were compromised to settle the case.  In the
absence of any allocation of the $47,500 to taxable costs, there is no basis to assume that the
settlement payment covered costs only.

III.    **Attorney's Fees**

The Fair Housing Act, 42 U.S.C. § 3613(c)(2), grants the court discretion to allow the prevailing party a reasonable attorney's fee and costs.  In construing fee-shifting statutes, the federal courts hold that a reasonable fee is one that is "adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004).  Determination of a reasonable fee begins with the calculation of the "lodestar," the product of a "reasonable hourly rate" and the "number of hours reasonably expended on the litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  After the lodestar has been determined, the court may further modify the fee award to take into account a number of circumstances, especially an adjustment for achieving only partial success. *See Hensley*, 461 U.S. at 435-36.  In the present case, plaintiffs' counsel seeks a total award of $587,905.00, to compensate the Miller Canfield firm for the expenditure of 2,614 hours by three partners, two associates, and two paralegals.  For the reasons set forth in detail below, this court finds that this represents a truly extravagant expenditure of time and resources on what should have been a relatively simple case.

A.    <u>Reasonable Rate</u>

The fee petition seeks to recover hourly billing rates from a high of $340 per hour for certain partner time to a low of $125 per hour for certain paralegal time.  Even plaintiffs' own proofs, especially the 2007 State Bar of Michigan Economics of Law Survey, show that these rates are somewhat on the high side.  Defendants have not objected to these rates, however, nor have they presented the court with any proof of unreasonableness.  Therefore, the hourly rates sought by

plaintiffs' counsel will be approved, as they fall within the reasonable range of rates charged in the West Michigan community for like legal services.

      B.    <u>Reasonable Time Expended for Compensable Activity</u>

The Supreme Court has long held that excessive hours must be disallowed in the determination of a reasonable rate.  In the landmark case of *Hensley v. Eckerhart*, the Supreme Court stated:

> The district court should also include from this initial fee calculation hours that were not "reasonably expended."  Cases may be overstaffed, and the skill and experience of lawyers vary widely.  Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.  "In the private sector, billing judgment is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's *client* are also not properly billed to one's *adversary* pursuant to statutory authority.

*Hensley*, 461 U.S. at 434 (citations omitted).  The party seeking an award of attorney's fees has the burden of proving the number of hours reasonably expended on the litigation.  *Hensley*, 461 U.S. at 433; *see Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999).

In support of their fee application, plaintiffs' attorneys represent to the court that this case was complex.  Indeed it was, but it should not have been.  Plaintiffs' counsel transformed what should have been a simple case into a discovery nightmare.  Although this court does not doubt that counsel expended the hours claimed, the crucial issue is whether they should have been expended in the exercise of the "billing judgment" that the *Hensley* Court identified as important.  *See Coulter v. State of Tenn.*, 805 F.2d 146, 151 (6th Cir. 1986) (hours actually expended may nevertheless be

-18-

found excessive if "the lawyer used poor judgment in spending too many hours on some part of the case.").

   This case had its genesis in the complaints of the individual plaintiffs, Kenneth and Teresa Miller, about the rental practices at the Clayborne Court Apartments. Clayborne Court is a 140-unit complex located in Kalamazoo, Michigan. It is by no means a high-end rental property. The vast majority of the apartments are one-bedroom (96 apartments) or studios (34 apartments). Only ten of the apartments have two bedrooms. The apartment complex was at all relevant times managed on a day-to-day basis by defendant Joseph Hunt. The record amply demonstrates that Mr. Hunt was a very unsophisticated, and even problematic, apartment manager. He used a number of advertisements, in many different media, that tended to create the impression that the apartment complex was really designed for senior citizens. His print advertisements, Internet advertisements, and other promotional aids often carried the words "senior friendly" and the like. Mr. Hunt used a personal computer for a number of functions relating to the management of the complex, including corresponding with prospective tenants by e-mail. Mr. Hunt was even less sophisticated in his use of the computer than he was in the management of rental properties.

   The individual plaintiffs, Kenneth and Teresa Miller, can hardly be described as model tenants. They began to rent at the Clayborne Court Apartments in 2004, taking one of the many one-bedroom apartments. Several months into their first lease term, they moved into a two-bedroom apartment. They stayed there for about a year, and then left. The Millers returned to Clayborne Court in 2006, asking for a two-bedroom apartment. Hunt told them that he had only one-bedroom apartments available. They took a one-bedroom apartment, and asked to be placed on the waiting list. This second rental term began with a one-year lease signed as of September 1, 2006.

After the first year, the parties extended the lease for a second one-year term, ending August 31, 2008. During this two-year leasehold period, the police were called more than once to respond to disturbances at the Millers' apartment.[6]

At some point during the two-year leasehold period, Teresa Miller approached plaintiff Fair Housing Center about Mr. Hunt. Hunt had employed Miller on a sporadic, part-time basis to help him in dealing with prospective renters. Miller reported to the Fair Housing Center that Hunt said he wanted to cater to an older clientele and that she should avoid renting to people with children. She reported that Hunt directed her not to show apartments to people with children, because the apartments were not big enough.

The relationship between the Millers and Mr. Hunt came to an all-time low on August 6, 2008, when Hunt called the police to report an assault against him by plaintiff Kenneth Miller. Hunt told the responding officer that Miller had threatened him on two previous occasions and that Kenneth Miller had acted in an assaultive way against him on that day. Three days later, on August 9, 2008, Hunt sent the Millers a letter informing them that he had decided not to renew their lease because of several "unfortunate occurrences." The letter contained this statement, "I don't want to hinder anyone's living environment, but our situation with apartments only marketed to an older clientele, maybe other options would be more appealing to you." (docket # 90-1, ID# 1027).

Teresa Miller returned to the Fair Housing Center, claiming that Hunt was discriminating against her and her husband on the basis of family status. According to Mrs. Miller,

---

[6] These disturbances are reported in Chief Judge Maloney's comprehensive opinion. (docket # 209 at pp. 6-7).

Hunt told her that he would never rent a two-bedroom apartment to her because her grandchildren might then move in with her.

In response to the complaints by the Millers, the Fair Housing Center sent testers to Clayborne Court in August and September of 2008 and again in February and May of 2009. During these tester visits, Hunt made statements to certain testers to the effect that the complex was marketed to an older clientele.[7] There is no evidence, however, that Hunt refused to rent to any tester representing a protected group.

Counsel initiated this action on June 26, 2009. At the time the complaint was filed, counsel had proof of two general categories of claims. First, Mr. Hunt had made numerous oral and written statements that at least arguably violated the Fair Housing Act, 42 U.S.C. § 3604(c), in that they indicated a preference based on familial status. Claims of this nature require little factual development, as the court is required to apply the "ordinary reader" standard to determine whether a particular advertisement or oral statement expresses a preference violation of the Fair Housing Act. *See Hous. Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.*, 943 F.2d 644, 646 (6th Cir. 1991). The second category of claim was based on the allegations of the Miller family. They claimed that Hunt refused to rent them a two-bedroom apartment on the basis of their familial status, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), which prohibits housing discrimination on the basis of, among other things, race, color or familial status. They further claimed that the failure to renew their lease when it expired in 2008 was likewise based on their familial status and, furthermore, was racially motivated. The basis for this claim was far-fetched, to say the least. The

---

[7] Again, the interested reader should refer to Judge Maloney's opinion (pp. 9-11) for a summary of the tester visits.

Millers asserted that one of their daughters (who did not live with them) was dating an African-American man and that Hunt allegedly expressed his disapproval of the man's presence at the complex. By the time summary judgment motions were filed, plaintiffs were able to present no proof in support of a race discrimination claim. Judge Maloney found the claim to be abandoned. (Op. at 45-46, docket # 209). In any event, at the time the case was filed, plaintiffs had some proof of violations of the Fair Housing Act arising from statements and advertisements that arguably flunked the "ordinary reader" test. They also had at least an arguable case of familial status and race discrimination on behalf of the Millers, but faced significant proof problems, because the Millers were clearly guilty of misbehavior that would have made them unwelcome tenants at most apartment complexes.

What plaintiffs did not have at the outset of this case was any real evidence of pervasive discrimination at Clayborne Court in its actual renting practices and policies. The exercise of sending in testers, which often reveals a pattern of disparate treatment among classes of prospective renters, came up empty. Plaintiffs had no evidence on the basis of the tester visits that any tester had been denied a rental opportunity on the basis of race or familial status. The testing exercise merely uncovered more evidence of problematic statements by Mr. Hunt. Nevertheless, plaintiffs charged ahead with a broad-gauged lawsuit claiming not only advertising violations of section 3604(c), but also substantive claims of pervasive family-status and race discrimination.

Plaintiffs' complaint reflects the paucity of real proof available to plaintiffs at the time they chose to bring this action. As Chief Judge Maloney has already observed, the complaint is pled in conclusory terms, and does not even attempt to differentiate the claims of the individuals versus

the claims of the Fair Housing Center.  The complaint did not serve to pin plaintiffs down to any

particular factual theory of liability, leaving all possibilities open:

> For the purpose of the counts in the complaint, the complaint does not distinguish
> between the Millers and FHC, or between any of the four Defendants.  In fact, the
> counts in the complaint are written as succinctly, and in the most generic terms,
> possible.  In Count 1, the complaint asserts that Defendants have discriminated
> against Plaintiffs on the basis of Plaintiffs' race and familial status in violation of the
> FHA, § 3604(a) and § 3604(c).  (Compl. ¶¶ 30-32.)  In Count 2, the complaint asserts
> Defendants have committed unlawful acts of discrimination based on race or color
> against Plaintiffs in violation of 42 U.S.C. § 1982.  (Compl. ¶¶ 33-34.)  In Count 3,
> the complaint asserts Defendants have discriminated against Plaintiffs and committed
> unlawful housing practices on the basis of race, age, and familial status in violation
> of the Elliot[t]-Larsen Civil Rights Act, § 37.2501(1)(a)-(d) and (f).

(Op. at 24, docket # 209).  This method of pleading, which the court concludes must have been

deliberate, allowed plaintiffs free reign to conduct discovery and to fashion claims on the fly.

A reasonable approach to this case would have entailed discovery into the facts

surrounding the Millers' tenancy and the defendants' use of discriminatory advertisements,

statements and policies in possible violation of the Fair Housing Act.  This exercise should not have

been discovery-intensive.  The claims of the Millers involved only two acts or omissions by

defendants:  failure to upgrade the Millers to a two-bedroom apartment and failure to renew the lease

at its expiration.  Discovery concerning the allegedly discriminatory statements should not have been

complex, either.  Plaintiffs were already aware of several problematic advertisements and statements

by Mr. Hunt.  Discovery of like advertisements in print, Internet, and other media should not have

required much discovery effort.  Specifically, plaintiffs were not required to show any discriminatory

intent to establish a violation of section 3604(c) of the Fair Housing Act.  A plaintiff merely must

meet the objective "ordinary reader" standard to show that a written or oral communication indicates

a discriminatory preference.  Importantly, a plaintiff need not establish discriminatory intent on the

-23-

part of the speaker to establish a statutory violation under the "ordinary reader" standard. *Housing Opportunities*, 943 F.2d at 646. Consequently, extensive discovery should not be necessary to meet a plaintiff's burden of proof under this objective standard, which asks only whether an ordinary reader would find that the particular advertisement or statement indicates a preference against renting to a protected group. *See Miami Valley Fair Hous. Ctr. v. Connor Grp.*, 725 F.3d 571, 577 (6th Cir. 2013).

It is virtually impossible to see how the exercise of billing judgment would lead a law firm to invest 2,600 hours, by seven different billers, in the pursuit of such a simple case. A hard-working attorney lucky enough to bill 40 hours a week, 50 weeks per year, would bill only 2,000 hours per year. Thus, 2,600 hours represents significantly more than one year of attorney time, expended in pursuit of a single case, without distraction. Viewed another way, 2,600 hours would be expended over the life of a three-year case by a single attorney who worked exclusively on that case, and, at most, only two other similar cases during an entire three-year period.

The reason that plaintiffs' counsel made this incredible expenditure of time on a simple case is disclosed by the firm's billing records. (Ex. A to Plf. Brief, docket # 253-1, ID#s 4120-4287). The great bulk of counsel time was expended in discovery and motion practice, especially in pursuit of electronically stored information (ESI), notoriously the most expensive discovery method. This single-minded focus on discovery of ESI engendered predictable disputes over discovery, which required more than the usual level of court intervention. One of plaintiffs' discovery motions was directed to ESI and requested permission to take a forensic image of the office computer at the Clayborne Court Apartments. In adjudicating the motion, the court found that the requests for production that plaintiffs were seeking to enforce were "uniformly overbroad and

-24-

unreasonable." With regard to plaintiffs' requests to image defendants' computer, plaintiffs had failed to cite the controlling Sixth Circuit authority in this area, *John B. v. Goetz*, 531 F.3d 448 (6th Cir. 2008), and so utterly failed to meet the test established by the Court of Appeals for such expensive and intrusive discovery. The court denied all relief sought by plaintiffs (Order, docket # 119), but unfortunately this did not end plaintiffs' fixation on electronic discovery.

As so often happens in cases involving ESI, allegations were made that defendants failed to preserve relevant evidence. In this case, the evidence consisted of e-mail communications between Mr. Hunt and prospective tenants. In the larger context of this case, the e-mail communications were essentially duplicative of evidence already in the possession of the parties, as defendants were able to produce many such e-mails. Nevertheless, the sought-after e-mails were certainly discoverable under the broad standards of Rule 26. Once plaintiffs were able to establish that some e-mails were missing, the tenor of the case shifted from discovery (again predictably) to sanctions. Thus, long after the close of the discovery period established in the case management order, plaintiffs were pressing for discovery addressed not to the merits of the case but to the question of the missing e-mails. This led to a demand to re-depose Mr. Hunt, a demand for an evidentiary hearing, and even an inquiry into his physical and mental state, once it became apparent that Mr. Hunt's confusion and computer incompetence lay at the heart of the alleged spoliation. Plaintiffs filed three separate motions for sanctions involving the lost e-mails. (docket #s 159, 186, 238). By the time plaintiffs filed their third motion for sanctions, Chief Judge Maloney had already ruled, as a matter of law, that defendants' "Tenant Selection Criteria" violated section 3604(c). (Op. at 40, docket # 209). The court found that this criteria had been sent to at least two prospective renters by e-mail. (*Id.* at 3-4). "The ordinary reader would interpret the words used as discouraging

families from seeking to rent an apartment." (*Id.* at 40).  By that stage of the case, the sanctions were of little value, but that did not deter counsel from pursuing the issue.  Thus, plaintiffs' counsel shifted emphasis from resolution of the underlying dispute to proliferation of subsidiary disputes about discovery, creating a "case within a case."

The level of effort expended by plaintiffs' counsel to track down the last responsive e-mail might be reasonable in some cases, but it was not reasonable in this case.  It appeared to this court on more than one occasion that plaintiffs were treating the case as a litigation workshop on discovery of ESI rather than a lawsuit.  This case did not involve discovery of patent records contained in Ford Motor Company's super-computers.  Rather, the subject matter of the litigation was an apartment complex in Kalamazoo, run by a marginally competent apartment manager who used a desktop and a laptop.  He was often in over his head, especially with regard to record-keeping and computer use.  Ninety-nine out of 100 lawyers would never consider making this case the occasion for extensive discovery of electronic evidence.  And no client paying his or her own bills would ever authorize such an expensive hunt for marginal evidence.

The unreasonable zeal with which counsel pursued electronic discovery issues shows through in the fee petition itself:

> The issues in the case, and in particular the defenses raised by Defendants throughout this litigation, were highly fact-dependent, and required the development of an extensive evidentiary record.  As a consequence, the skill and perseverance of Miller Canfield's Electronic Discovery + Records Management Team was needed in order to manage and organize the extensive evidentiary record.  That Team's experience and skill was also valuable in this case given that the spoliation and misrepresentations of Defendant Hunt had initially persuaded the Court that there were no emails reflecting communications with prospective tenants.

(Brief in Support of Motion for Attorney's Fees at 19, docket # 253).  Whatever else this case required in the exercise of reason, it certainly did not require "the skill and perseverance of Miller Canfield's  Electronic Discovery + Records Management Team."

Exacerbating this problem, and closely related to it, was the law firm's decision to overstaff this case.  According to the firm's time records, work on this case began on April 14, 2009, approximately two months before the complaint was filed.  (Plf. Ex. A, docket # 253-1 at ID# 4120).  At that point, the case was assigned to a partner and an associate, a reasonable staffing decision.  On February 1, 2010, the time records show the beginning of involvement by Kenneth Treece, who, according to his resume (Plf. Ex. G, docket # 253-2 at ID# 4317), specializes in electronic discovery as a member of the "Electronic Discovery + Records  Management Team."  Mr. Treece would ultimately expend 260 hours in the case, principally devoted to discovery.  Shortly thereafter, a second partner, Kurt McCamman became involved.  (Entry of 2/09/10, docket # 253-1 at ID# 4137).  He ultimately devoted 187 hours to the case.  Three days later, a third partner, Brad Sysol, joined the case.  (Entry of 2/12/10, docket # 253-1 at ID# 4138).  Almost immediately, the file was being billed by three partners, often one or more of them working the file each day.  In June of 2010, two paralegals became involved, principally to work on discovery and to load documents into an electronic management document system called "Summation."  Once the paralegals became involved, they devoted substantial time to the case, exceeding 500 hours between them.  As a consequence, as the case hit its stride during the second half of 2010, the file was being billed by three partners, two associates, and two paralegals.

Plaintiffs have not attempted to justify why a case of this magnitude required the almost constant attention of five lawyers and two paralegals.  In the experience of this court, even

the federal government, which is often criticized for its profligacy, would not staff an enforcement action of this nature with a small platoon of attorneys.  To their credit, plaintiffs' counsel have excluded from the bill a few clearly duplicative time entries, such as conferences among counsel or attendance at hearings by more than one attorney.  These minor exclusions, however, do not begin to address the waste and duplication inherent in a decision to overstaff a piece of litigation.  Although the initial staffing decision was reasonable, within six months of its filing, the staffing in this case spun out of control.  It is doubtful that any general counsel of a corporation would have authorized this level of overstaffing, given the issues and complexity of the case.  It is highly unlikely that a reasonable staffing decision (one partner, one associate, and one paralegal) could possibly have resulted in the billing of 2,600 hours over the life of this case.

The staffing of this case suffered from a related flaw:  it was top-heavy.  Purchasers of legal services generally require that work be performed by the person with the lowest billing rate who is competent to perform that service.  This usually results in a greater expenditure of associate time, while partners perform only those tasks that they alone can do.  The over-utilization of partners in this case, however, led to the opposite result.  Virtually half the hours expended were billed by partners (1,013 partner hours against 1,096 associate hours), at hourly rates approximately double those charged for associates.  (docket # 253-1 at ID# 4287).  Thus, the overstaffing of this case caused not only the billing of excessive hours but also the billing of many hours at an inappropriately high hourly rate.  If this situation had occurred in a case overseen by corporate counsel, it would have been remedied quickly.  That check, however, was not at work in the present case.

Scrutiny of the billing records on one discrete project -- the preparation and argument of plaintiffs' *Daubert* motion -- discloses one of many examples of the expenditure of excessive

time, by too many attorneys. The *Daubert* motion was addressed to the testimony of defense expert witness Sharon M. Filas, CPA. The principal data collection and analysis performed by Ms. Filas involved reviewing information from the U.S. Census Bureau's American Community Survey for a four-year period with regard to demographics in the Kalamazoo area. She then compared this information to information concerning the demographics of people who lived in the Clayborne Court complex. In addition to this statistical comparison, Ms. Filas ventured certain opinions concerning the renting habits of various classes of renters. Plaintiffs' *Daubert* motion sought to exclude the Filas report in its entirety.

Exhibit A to plaintiffs' motion for attorney's fees shows the following expenditure of time on the *Daubert* motion.

| Date | Attorney | Task | Hours | Rate | Charge |
|------|----------|------|-------|------|--------|
| 12/10/2010 | Sysol | Review transcript of expert | 0.8 | 290 | $232.00 |
| 12/11/2010 | Sysol | Legal research re expert opinions | 2.2 | 290 | $638.00 |
| 12/15/2010 | Sysol | Additional research; read and mark dep. transcript | 4.8 | 290 | $1,392.00 |
| 12/16/2010 | Sysol | Continued research; email to defense atty | 3.9 | 290 | $1,131.00 |
| 12/17/2010 | Sysol | Work on motion and brief to exclude expert | 4.2 | 290 | $1,218.00 |
| 12/21/2010 | Sysol | Work on brief | 8.8 | 290 | $2,552.00 |
| 12/30/2010 | Sysol | Work on motion and brief; draft motion re page limit | 2.9 | 290 | $841.00 |
| 1/3/2011 | Treece | Review brief and forward case law to Sysol | 1.2 | 175 | $210.00 |
| 1/4/2011 | Huff | Conference re Daubert motion; review draft | 0.6 | 175 | $105.00 |
| 1/4/2011 | Sysol | Conference re motion to exclude | 0.3 | 290 | $87.00 |
| 1/7/2011 | Treece | Review motion and revise brief to exclude | 0.8 | 175 | $140.00 |
| 1/7/2011 | Yelton | Work on Daubert motion | 0.6 | 340 | $204.00 |
| 1/10/2011 | Yelton | Work on brief to exclude expert opinions | 2.5 | 340 | $850.00 |
| 1/10/2011 | Sysol | Proofread, revise and edit motion to exclude * | 2.6 | 290 | $754.00 |
| 1/19/2011 | Sysol | Review and calender notice from court re hearing | 0.1 | 290 | $29.00 |
| 1/25/2011 | Sysol | Review "various filings" related to defense response | 1.2 | 290 | $348.00 |
| 1/27/2011 | Yelton | Review defendants' response to motion to exclude | 0.9 | 340 | $306.00 |
| 2/7/2011 | Sysol | Review and analyze defense brief; research for reply | 1.8 | 290 | $522.00 |
| 2/8/2011 | Huff | Research and drafting for reply brief | 1.8 | 175 | $315.00 |
| 2/8/2011 | McCamman | Research standards for expert evidence on demographics | 1.9 | 320 | $608.00 |
| 2/9/2011 | Sysol | Work on reply brief in support of motion to exclude | 2.8 | 290 | $812.00 |
| 2/8/2011 | Yelton | Review reply brief | 0.5 | 340 | $170.00 |

| 2/9/2011 | Huff | Research on statistical analysis for reply brief | 2.8 | 175 | $490.00 |
| 2/9/2011 | Sysol | Draft reply brief and perform further research | 5.1 | 290 | $1,479.00 |
| 2/10/2011 | Yelton | Edit reply brief | 1.3 | 340 | $442.00 |
| 2/14/2011 | Sysol | Prepare for oral argument | 3.3 | 290 | $957.00 |
| 2/15/2011 | Sysol | Prepare for oral argument | 7.8 | 290 | $2,262.00 |
| 2/16/2011 | Sysol | Prepare for oral argument; argue motion; talk to client | <u>7.8</u> | 290 | <u>$2,262.00</u> |
| | | | 75.3 | | $21,356.00 |

\* This time entry was block-billed to two motions.  One-half the time has been allocated to the *Daubert* motion.

Thus, plaintiffs' counsel wishes to tax over $21,000 in fees for over 75 hours spent on a *Daubert* motion.  Typical for this case, the motion was touched by no fewer than five lawyers, all of whom billed some time to the project.  The great bulk of time, however, was spent by a single partner, who did virtually all of his own legal research and writing at an hourly rate approaching $300.  Only 7.2 of the hours expended were worked by associates (Huff and Treece); more than 90% of the time was billed at partner rates.  Performing basic research on well-settled *Daubert* principles should not require the expertise of a $300 per hour partner.  The *Daubert* motion did not present any esoteric legal issues, nor was the subject matter of the motion highly complex:  a CPA merely accessed readily available Government demographic statistics and applied them to the population of the apartment complex.  Moreover, it is inconceivable that a partner charging this hourly rate would find it necessary to spend over 11 hours preparing for an oral argument that lasted less than one hour.  (*See* Hearing Minutes, docket # 155).

The *Daubert* motion was essentially unsuccessful.  The court accepted the statistical work done by Ms. Filas, but excluded her gratuitous comments concerning the preferences of certain classes of renters.  (*See* Mem. Op. & Order, docket #s 157, 158).  The excluded comments were essentially matters of common sense or general observation, for which Ms. Filas had no particular

expertise.  Leaving aside, however, the marginal result achieved, the billing practices of plaintiffs'

attorneys demonstrate how over-lawyering a case can lead to grossly excessive billing.  No client

with any sense of cost-benefit analysis would authorize the expenditure of more than $21,000 in

attorney time on this particular project.  At the same time that this project was being pursued,

plaintiffs' attorneys were putting in similarly excessive amounts of time on summary judgment

motions.

        The fundamental flaws in the fee petition identified in this opinion -- excessive hours,

overstaffing, and top-heavy structure -- make it impossible to review the petition on a line-by-line

basis.  These problems pervade the petition and represent fundamental errors in judgment concerning

the prosecution of this case.  In these circumstances, some courts endorse a complete denial of

attorney's fees, especially where, as here, the total fee sought is shockingly excessive.  *See Fair*

*Hous. Council of Greater Washington v. Landow*, 999 F.2d 92, 96 (4th Cir. 1993); *see also First*

*State Ins. Group v. Nationwide Mut. Ins. Co.*, 402 F.3d 43, 44 (1st Cir. 2005); *Brown v. Stackler*, 612

F.2d 1057, 1059 (7th Cir. 1980).  It would be well within the court's discretion to deny plaintiffs'

motion for attorney's fees in its entirety.  This approach, however, would be unduly harsh under the

specific facts of this case because plaintiffs were clearly prevailing parties on some claims and

counsel's reasonable efforts should be compensated, even though their overall approach to the case

was clearly excessive.

        An alternative approach endorsed by the Sixth Circuit in cases where reductions to

the requested number of hours reasonably expended on the litigation are clearly appropriate is a

simple across-the-board reduction by a certain percentage as an alternative to line-by-line reductions,

particularly where, as here, the fee documentation is voluminous.  *See Auto Alliance Int'l, Inc. v.*

*U.S. Customs Serv.*, 155 F. App'x 226, 228 (6th Cir. 2005); *Hudson v. Reno*, 130 F.3d 1193, 1209 (6th Cir. 1997) (applying across-the-board reduction), *overruled on other grounds by Pollard v. E.I. DuPont de Nemours & Co.*, 532 U.S. 843 (2001).  Where fee documentation is voluminous, "an hour-by-hour review is simply impractical and a waste of judicial resources." *Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994).  The Sixth Circuit has noted the problems caused by fee petitions that present excessive hours.  *Coulter v. State of Tenn.*, 805 F.2d 146, 150-51 (6th Cir. 1986).  The *Coulter* court found, among other things, that the trial court did not abuse its discretion in reducing compensable pretrial preparation hours by a full fifty percent.  *Id.* at 152.

This approach appears to be fair, workable, and within the court's discretion.  The percentage reduction, however, must not be arbitrary.  Reference to the time spent on the partially successful *Daubert* motion provides significant guidance.  Plaintiffs' counsel billed over $21,000 in fees for this motion, representing 75.3 attorney hours.  The time itself was excessive, but the excessiveness is complicated by the fact that too many of the hours were billed at partner rates.  A rational division of labor would have assigned research and writing to an associate, with significant oversight by a single partner (not three partners) and argument of the motion to the responsible partner.  Research and writing the motion, brief and reply brief should have taken no more than 20 hours of associate time, with 7 hours devoted by a partner to editing and revision.  It is hard to see how a partner could spend more than 5 hours in preparing for a one-hour oral argument, especially in light of the recency of the briefing.  And 3 hours should be allowed for the hearing, immediate preparation, and aftermath.  This approach yields 35 hours, in place of the 75.3 originally billed, but also results in a much more economical bill to the client.

| Biller | Hours | Rate | Total |
|--------|-------|------|-------|
| Associate | 20 | $175 | $ 3,500 |
| Partner Drafting | 7 | 290 | 2,030 |
| Partner Preparation and Argument | 8 | 290 | 2,320 |
| Total | 35 | | $ 7,850 |

The foregoing analysis discloses that a general 50% reduction in all billed hours is warranted, but an across-the-board approach is not.  Rather, the reduction should take into account the excessive partner involvement in this case.  To reflect the staffing decisions that should have been made in this case, the court will apply a 60% reduction to partner hours, but only a 40% reduction in associate hours.  This reduction yields 657.6 compensable associate hours and 405.2 compensable partner hours, a much more defensible partner/associate ratio.  Paralegal effort will be reduced by 50%, yielding 252.5 compensable hours.

| Original Hours | Reduced Hours | Fees |
|----------------|---------------|------|
| Partners - 1,013 | 405.2 | $133,192.00 |
| Associate - 1,096 | 657.6 | 115,080.00 |
| Paralegal - 505 | 252.5 | 31,562.50 |
| | | Total    $279,834.50 |

Applying this methodology yields a lodestar figure of $279,834.50.  This lodestar amount ascribes to each of plaintiffs' attorneys and paralegals the hourly rate requested by plaintiffs. Of the 2,614 hours claimed by plaintiffs' counsel, this lodestar calculation gives credit to 1,315.3 hours, slightly more than half.  The top-heavy makeup of compensable hours in the fee petition,

-33-

however, has been modified to reflect a more reasonable ratio of approximately 70% associate hours to 30% partner hours.

        C.     <u>Reduction For Partial Success</u>

One of the most vexing issues in attorney-fee litigation concerns reduction of the lodestar amount to reflect limited success. The seeds of the controversy were laid in the *Hensley* opinion itself. The *Hensley* Court clearly held that if "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." 461 U.S. at 436. This is true even in cases where the plaintiff's claims were "interrelated, non-frivolous, and raised in good faith." *Id.* The *Hensley* Court therefore focused on the relationship of the fees sought to the results obtained. *Id.* at 440. The Court has continued to focus on the degree of success obtained as "the most critical factor" governing the reasonableness of an attorney's fee award. *See Farrarr v. Hobby*, 506 U.S. 103, 114 (1992). In the same *Hensley* opinion, however, the Court observed, "where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." 461 U.S. at 435. Consequently, in the thirty years following *Hensley*, defendants argue for a significant cut in the lodestar amount where plaintiff has not received all the relief sought, while plaintiff's counsel routinely argues that the results were "excellent" and that a fully compensatory fee should be awarded. This case is no exception.

Predictably, plaintiffs' counsel argues that the $47,500 settlement amount, coupled with the relief gained through the Settlement Agreement, represent an "excellent result," giving plaintiffs all that they had requested and all that they could have been awarded after a full trial on the merits. This hyperbolic description of the results obtained in this case does not bear scrutiny in

-34-

light of the record. The results garnered by plaintiffs in this case were far less than a complete victory.

As noted previously in this opinion, plaintiffs' broadly pleaded claims fell within three general categories: (1) familial status and race discrimination against the named plaintiffs, Kenneth and Teresa Miller, arising from the failure to upgrade them to a two-bedroom apartment and the decision not to renew their lease. (Included in this broad category are the claims in count 2, brought pursuant to 42 U.S.C. § 1982, alleging discrimination on account of race or color.); (2) violations of section 3604(c) of the Fair Housing Act, based on written and oral statements allegedly expressing a preference against families; and (3) substantive discrimination against families and minorities in the actual rental practices at the apartment complex in violation of section 3604(a).

Chief Judge Maloney's summary judgment opinion in this case is the best indication of the scope and breadth of claims asserted by plaintiffs, as those claims had developed through the course of litigation. (Op., docket # 209). Judge Maloney identified two claims by the Millers. The first was for familial status discrimination for the denial of a two-bedroom apartment. The second was a claim for familial status discrimination and race discrimination arising from the failure to renew their lease. The court found that claims arising from the failure to upgrade the Millers to a two-bedroom apartment could proceed to trial. With regard to the claims arising from the failure to renew the lease, the court rejected the familial status claim, finding that the Millers' assaultive conduct provided a legitimate, non-discriminatory reason for the decision not to renew the lease, which was not shown to be a pretext. (Op. at 29). The court rejected the Millers' race discrimination claim under the FHA, the Elliott-Larsen Act, and 42 U.S.C. § 1982, citing plaintiffs' failure to address this claim or to support it with any proof. (Op. at 46). The court went on to hold

that even if a *prima facie* case had been made, defendants offered a legitimate, non-discriminatory justification for a non-renewal of the lease, which was not shown to be pretextual. (*Id.*).

In summary, then, after summary judgment, there was virtually nothing left of the Millers' claims. Their most valuable claim, for non-renewal of the lease, had been rejected on all grounds. Left for trial was a problematic claim arising from defendants' failure to give plaintiffs a two-bedroom apartment, a claim of dubious economic value. The court also allowed an alleged violation of section 3604(c) to go to trial, based on the content of Mr. Hunt's letter terminating the tenancy. And the only claim of race discrimination under 42 U.S.C. § 1982 brought on behalf of an identifiable person had been dismissed on its merits.

In the summary judgment briefing, plaintiffs identified a number of allegedly discriminatory statements and advertisements made by defendants. As noted in the Statement of Facts, the court found only one statement (the Tenant Selection Criteria) justified the entry of summary judgment for plaintiffs on the basis of the statement's clear violation of the "ordinary reader" standard. (Op. at 38-40). The court found the legality of other challenged statements was not susceptible to resolution on summary judgment. The court also denied plaintiffs a summary judgment on their claims under section 3604(a) for actual discrimination, finding that genuine issues of material fact precluded summary judgment. (*Id.* at 40-43).

With regard to claims by the Fair Housing Center of actual discrimination on the basis of familial status, age and race, the court found that neither party was entitled to summary judgment. (Op. at 46-53).[8]

---

[8] Plaintiffs' claims of age and race discrimination were clearly make-weight claims, relying completely on the ability to show familial status discrimination. Plaintiffs asserted a disparate impact claim on the basis of age and race, arguing that a preference against families resulted in a

Thus, as the parties proceeded to trial, plaintiffs had prevailed on only one claim: a facial challenge to the Tenant Selection Criteria brought under section 3604(c). The Millers lost their principal case, arising from the termination of their tenancy. The principal issues at trial would have been the legality of the other challenged statements and advertisements under the ordinary reader rule and whether the Fair Housing Center could establish actual familial status discrimination against renters and prospective renters at the complex (and, derivatively, whether such discrimination had a disparate impact on account of age or race). These unresolved issues formed the backdrop for the settlement reached in July 2012, approximately four months after Judge Maloney issued his opinion.

1.      Settlement Agreement:  Non-Monetary Relief

As noted, the claims of the Fair Housing Center remaining for trial were the legality of certain advertisements and oral statements under section 3604(c) of the Fair Housing Act and the existence of actual discrimination in the leasing of apartments under section 3604(a). Review of the Settlement Agreement, in the context of the entire record of this case, shows that plaintiffs gained relief on the section 3604(c) claims, but received no relief on any claim of actual discrimination. In this regard:

• The court never found that defendants had engaged in discriminatory rental practices. Even with regard to the Tenant Selection Criteria, which the court

---

preference against the young (age discrimination) and that the same preference against families had a disparate impact on minorities, because minorities are more likely to have families. Thus, the success of the age and race claims was completely dependent on plaintiffs' ability to establish familial status discrimination. It is unclear to this court why plaintiffs expended time and effort to establish these derivative claims, which added nothing of substance to the case.

found to contravene section 3604(c) on its face, the court refused to enter summary judgment for plaintiffs with regard to the document's actual effect on housing practices under section 3604(a).

- Defendants never admitted discrimination against any protected person. The Settlement Agreement, in fact, expresses defendants' denial of such allegations. (Settlement Agreement, ¶¶ I(D), (E), docket # 247-1 at ID#s 3814-15). The Settlement Agreement specifically provided that the agreement was not to be considered as an admission of any finding of violation by defendants of the Fair Housing Act, the Elliott-Larsen Act, or the Civil Rights Act. (*Id.*, ¶ I(G), docket # 247-1 at ID# 3815).

- The Settlement Agreement does not purport to enjoin or otherwise restrain defendants from violating any non-discrimination statute or from committing any act of discrimination. Rather, the Settlement Agreement is procedural only, establishing procedures and monitoring mechanisms and requiring modification of the written materials used by the complex.

Thus, under no reading of the record can plaintiffs be deemed to have prevailed on their principal claim in this case: family-status discrimination by defendants against tenants or prospective tenants. The complaint specifically sought a declaration that the discriminatory practices of defendants violate the Fair Housing Act and other law (Compl., docket # 1, Prayer for Relief ¶ 1) and an injunction against defendants prohibiting discrimination "on the basis of race, age and familial status against any person or entity engaged in a residential real estate related transaction." (*Id.*, ¶ 2). Plaintiffs never proved discrimination, nor did they receive any relief from the court or

-38-

the Settlement Agreement against actual discrimination on the basis of race, age or familial status. The result achieved in this case cannot be considered a total victory by any stretch of the imagination.[9]

The complaint also prayed for certain procedural changes and monitoring oversight. The Settlement Agreement essentially gave the Fair Housing Center the procedural and monitoring relief sought.

Plaintiffs candidly admit that "well over" 90% of the time spent on this case was devoted to the claims of the Fair Housing Center. (Reply Brief at 6 n.4, docket # 260). The general claims advanced by the Center were discriminatory statements and advertising in violation of FHA § 3604(c), and a pattern and practice of actual discrimination in violation of section 3604(a). The court and the Settlement Agreement granted relief only on the first claim, which, as noted above, is easily proven and should have required little discovery. The bulk of counsel's efforts were devoted to proving a pattern of actual discrimination. "Throughout this litigation Plaintiffs have tried to get Defendants to understand that the crux of this case is not the Millers' claims -- the crux of the case is the FHC's claims that there has been a pattern and practice of discrimination at Clayborne Court Apartments for many years." (Plf. Reply Brief at 6 n.3, docket # 260). The Center, however, never

_____

[9] In an effort to demonstrate that the Settlement Agreement provided them with a complete victory on all non-monetary relief sought, plaintiffs presented the court with a chart, purporting to compare the relief requested in the complaint with the relief granted in the Settlement Agreement. (Reply Brief, docket # 260, Ex. D). This chart misleadingly omits the first two requests for relief in the complaint, which sought declaratory and injunctive relief against actual discrimination. (Compare Prayer for Relief (ID#s 9-10) with Ex. D (ID#s 4597-4600)). Only by omitting the most significant prayers for relief can plaintiffs claim a complete victory. This presentation falls short of the duty of candor expected of officers of this court.

proved such a pattern or practice of actual discrimination, and the Settlement Agreement provides no relief on this claim.

A candid approach to the fee issue in this case would have acknowledged the partial nature of the success afforded by the Settlement Agreement and would, furthermore, have attempted to identify and exclude the time spent by plaintiffs' law firm in its unsuccessful attempt to assert a claim of actual discrimination. A review of the firm's time records shows that a significant amount of time was devoted to the compilation of information concerning the tenant makeup of the housing complex and the demographics of the area. These time records show a significant expenditure of time in reviewing tenant records and putting together charts and other demonstrative aids in an effort to show systemic patterns of discrimination. This time was identifiable and not intertwined with the time spent on the successful section 3604(c) claims. It should all have been excluded, as plaintiffs received no substantive relief on any claim of actual discrimination.

### 2. Settlement Agreement: Monetary Relief

The Settlement Agreement awarded plaintiffs the total sum of $47,500.00. The agreement does not apportion this award between the Millers and the Fair Housing Center, nor does it allocate any part of this sum to any particular item of damages. Rather, this sum represents a payment made in full satisfaction of all claims by any plaintiff.

Plaintiffs' present contention that this sum represents everything they could have requested and received in a jury trial is unsupportable. Defendants have provided the court with a copy of plaintiffs' case evaluation statement, presented to three case evaluators in March of 2011.[10]

---

[10] Case evaluation is one of the methods of alternative dispute resolution provided for in this court's Local Rules. *See* W.D. MICH. LCIVR 16.5. The Local Rules provide that all ADR

-40-

In their case evaluation statement, filed more than one year before this case was resolved by settlement, plaintiffs sought an award of damages in the amount of $252,602. This represented litigation costs of about $19,000, an award of emotional distress and humiliation in the amount of $15,000, an award of future expenses for monitoring of $18,000, and punitive damages in the amount of $200,000. Plaintiffs also demanded attorney's fees exceeding $418,000.[11] Plaintiffs' decision to settle this case clearly represented a monetary compromise.

Comparison of the case evaluation demand and the amount accepted by plaintiffs in settlement discloses that the principal difference is punitive damages. Plaintiffs sought $200,000 in punitive damages from the case evaluators. (Brief, Ex. 7, docket # 256-2 at ID#s 4444-45). Obviously, the settlement amount covered most of the economic damages sought but not any punitive damages. Plaintiffs now seek to ignore this aspect of their case, but that is not easily accomplished. Plaintiffs clearly demanded an award of punitive damages in their complaint (ID# 10, ¶ 5); they presented an argument to the case evaluators for $200,000 in punitive damages; and

---

proceedings are considered to be compromise negotiations within the meaning of Fed. R. Evid. 408. W.D. MICH. LCIVR 16.2(d). Evidence Rule 408, in turn, provides that offers to compromise, and conduct or statements made during compromise negotiations, are not admissible "either to prove or disprove the validity or amount of a disputed claim." FED. R. EVID. 408(a). Such evidence is, however, admissible for another purpose. FED. R. EVID. 408(b). In this case, defendants did not proffer the case evaluation statement to prove or disprove the validity or amount of any disputed claim. Rather, the case evaluation statement is proffered as evidence of the extent of the claim for damages asserted by plaintiffs during the life of this case. Rule 408 therefore provides no bar to the consideration of such evidence. Plaintiffs asserted in a footnote in the reply brief that defendants' disclosure was "inappropriate," but then went on to argue that the evidence supported their claim for attorney's fees. (*See* Brief at 11-12, ID#s 4568-69).

[11] Significantly, the mediation statement sought declaratory relief that defendants' practices violate the Fair Housing Act, the Civil Rights Act, and the Elliott-Larsen Act and an injunction prohibiting defendants "from further discrimination against any person." This is the very relief against actual discrimination missing from the Settlement Agreement.

their fee petition contains 19.4 hours devoted to researching the punitive damages issue.[12]  On this record, plaintiffs cannot credibly argue that they received all the relief that they sought.

Plaintiffs' failure to receive any award of punitive damages in settlement is intimately related to their failure to receive any injunctive or declaratory relief against actual discrimination. Both types of relief are premised on a finding that a defendant intentionally discriminated against protected persons.  *See Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 (6th Cir. 2002) (punitive damages may be awarded for intentional or reckless violations of the FHA). Thus, the failure to collect any punitive damages, like the failure to obtain injunctive relief, is evidence that plaintiffs did not prevail on the principal issue in the case -- in their words, a "pattern and practice" of actual discrimination against protected individuals.  Although the failure to achieve greater monetary success, standing alone, would be a relatively minor factor, this monetary compromise reinforces the conclusion that plaintiffs did not obtain "excellent results" in this case. This is not a situation in which plaintiffs raised alternative legal grounds to obtain essentially the same relief.  *See DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 672 (6th Cir. 2006).  Plaintiffs' advertising claims under section 3604(c) were legally and factually distinct from their claims of actual discrimination under section 3604(a).  The advertising claims are easily proved; actual discrimination is not.  In essence, plaintiffs prevailed on the simpler claim, which entitled them to limited relief, but gained no relief on the more difficult claim, in which they invested the bulk of their effort.

---

[12] *See* time entries of 6/2/10; 3/5/11; 3/8/11; 5/18/12; 5/21/12; 5/25/12.  (docket # 251-2, ID#s 3890, 3971, 4006).

In summary, plaintiffs should be deemed to have prevailed substantially on their challenge under FHA § 3604(c) to certain statements and advertisements employed by Hunt in renting apartments at the Clayborne Court complex.  The court granted relief with regard to the Tenant Selection Criteria, and the Settlement Agreement effectively reforms defendants' policies in this regard.   Plaintiffs received no relief, however, on their independent claim of actual discriminatory practices in violation of section 3604(a).  The court awarded no relief on this claim, defendants have never admitted actual discrimination, and the Settlement Agreement does not purport to enjoin discrimination or require a change in rental practices.  Review of the time records shows that a majority of the attorney time devoted to this case was in pursuit of the actual discrimination claim, on which plaintiffs received no success.  Finally, the claims of the Millers were essentially wiped out on summary judgment, but very little of the case was devoted to their claims in any event.

If plaintiffs had made the effort to exclude the time clearly devoted to pursuit of the claims of actual discrimination, the hours claimed would have been substantially reduced.  The court's own review of the time records shows that substantially all of the paralegal time was devoted to this enterprise.  Disallowance of this time is clearly warranted, as it was devoted to proving a claim on which plaintiffs received no relief.  It is more difficult to cull out all the attorney time which, although substantial, is harder to apportion among claims.  In these circumstances, the Sixth Circuit has endorsed a percentage reduction to reflect partial success.  *See Ky. Rest. Concepts, Inc. v. City of Louisville*, 117 F. App'x 415, 421 (6th Cir. 2004) (35% reduction for partial success).  A modest reduction of 10% of attorney time appears defensible and probably results in a greater award to plaintiffs' counsel than a line-by-line deduction would.

-43-

The foregoing findings result in an attorney fee award of $223, 444.80:

| | |
|---|---|
| Lodestar | $279,834.50 |
| Minus Paralegal Time | 31,562.50 |
| | |
| Subtotal | $248,272.00 |
| Minus 10% of Lodestar Attorney Time | 24,827.20 |
| | |
| Award | $223,444.80 |

## Conclusion

It gives this court no pleasure to criticize the professional judgment of members of the bar of this court, especially in a public way.  Miller Canfield is a fine law firm, and the lawyers who worked on this case are skilled and ethical.  Anyone, however, can make errors in professional judgment, even major errors.  In the usual attorney-client relationship, there are natural checks on overstaffing a case, excessive expenditures of time, overzealousness and related errors in judgment.  Those checks do not exist in an enforcement action such as this.  The task of policing the exercise of judgment by lawyers, although unpleasant, therefore falls to the court.

The Supreme Court has identified a reasonable fee as one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case."  *Perdue v. Kenny A. ex rel. Winn*, 130 S. Ct. 1662, 1672 (2010).  An award of nearly a quarter million dollars in fees in a case of this magnitude certainly fits that definition.  Law firms asked to take on similar cases in the future would not be deterred by the prospect of an award in this amount for the efforts reasonably expended to produce the result achieved in this case.

A judgment awarding plaintiffs $223,444.80 in attorney's fees and $17,602.92 in costs will be entered.


Dated:  October 21, 2013                        /s/  Joseph G. Scoville
                                                United States Magistrate Judge